# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-3081

_____

Business Communications, Inc.

*Petitioner*

v.

United States Department of Education; Arne Duncan, in his official capacity as Secretary of Education

*Respondent*s

Brandon Mueller,

*Intervenor*

_____

Petition for Review of an Order of the
Department of Education

_____

Submitted: March 14, 2013
Filed: December 2, 2013

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Business Communications, Inc. ("BCI") was awarded contracts to install cable in the El Dorado and Beebe Arkansas school districts under the American Recovery

and Reinvestment Act ("ARRA"), Pub. L. No. 111-5, 123 Stat. 115 (2009). Branden Mueller, who worked for BCI on both projects, filed a complaint with the Department of Education ("DOE") alleging that BCI had terminated his employment after he complained about not being paid "prevailing wages" as required by ARRA. The Secretary of Education ("Secretary") reviewed a report by the Department of Education's Office of the Inspector General ("DOE's OIG") and ordered Mueller reinstated with back pay. BCI petitions for review of the Secretary's order, arguing that it was deprived of its Fifth Amendment due process rights because it never was afforded a hearing, either before or after the Secretary's decision. Because we find BCI was deprived of its due process rights, we grant the petition and vacate the Secretary's order.

I.

Congress enacted ARRA as a "stimulus bill" to fund a variety of projects and thereby encourage economic recovery. The statute imposes several conditions on contractors working on ARRA-funded projects, including that they pay their workers the wages "prevailing" among similar workers on similar projects in the region. ARRA § 1606, 123 Stat. at 303. Through § 1553 of the ARRA, Congress sought to encourage the reporting of improper action in connection with ARRA projects by providing whistleblower protections for employees of non-federal employers working on projects funded by ARRA appropriations. Section 1553 prohibits employers who receive stimulus funds from discharging, demoting, or otherwise discriminating against an employee as reprisal for disclosing, among other things, a violation of law, rule, or regulation related to an agency contract. *Id.* § 1553(a)(5), 123 Stat. at 297. A person who believes he or she has been subjected to a prohibited reprisal may submit a complaint to the appropriate agency's inspector general. *Id.* § 1553(b)(1), 123 Stat. at 297. Section 1553 specifies the standards for establishing reprisal against a whistleblower. "A person alleging reprisal under this section shall be deemed to have affirmatively established the occurrence of the reprisal if the person

demonstrates that a disclosure [covered by § 1553(a)] was a contributing factor in the reprisal." *Id.* § 1553(c)(1)(A)(I), 123 Stat. at 299. The complainant may satisfy this burden through circumstantial evidence, including evidence that the retaliating employer knew of the disclosure or that the reprisal occurred within a period after the disclosure such that a reasonable person might conclude that the disclosure had been a contributing factor in the reprisal. *Id.* § 1553(c)(1)(A)(ii), 123 Stat. at 299. The employer, however, has an opportunity for rebuttal, and "[t]he head of an agency may not find the occurrence of a reprisal . . . if the non-Federal employer demonstrates by clear and convincing evidence that the non-Federal employer would have taken the action constituting the reprisal in the absence of disclosure." *Id.* § 1553(c)(1)(B), 123 Stat. at 299.

The agency's office of the inspector general (here, the DOE's OIG) has 180 days to investigate the complaint and make a determination whether the complaint is frivolous or otherwise not actionable and, if not, submit a report to the complainant, the complainant's employer, and the head of the federal agency overseeing the contract.[1] *Id.* § 1553(b)(1)-(2), 123 Stat. at 297-98. Upon receipt of the OIG's report, the head of the agency (here, the Secretary) has a non-extendable thirty-day period to "determine whether there is sufficient basis to conclude that the non-Federal employer has subjected the complainant to a reprisal prohibited by [§ 1553(a)]." *Id.* 1553(c)(2), 123 Stat. at 300. If the agency head finds that the employer has engaged in unlawful reprisal, the agency head "shall" take one or more of three remedial actions: (1) order the employer to abate the reprisal, *id.* § 1553(c)(2)(A), 123 Stat. at 300; (2) order the employer to reinstate the complainant and to provide "compensation (including back pay), compensatory damages, employment benefits, and other terms and conditions of employment that would apply to the person in that

---

[1]The 180 days is extendable by agreement between the inspector general and the complainant or by the inspector general unilaterally upon written explanation. ARRA § 1553(b)(2)(B).

position if reprisal had not been taken," *id.* § 1553(c)(2)(B), 123 Stat. at 300; or (3) order the employer to pay the complainant "an amount equal to the aggregate amount of all costs and expenses (including attorneys' fees and expert witnesses' fees) that were reasonably incurred" in connection with bringing the complaint, *id.* § 1553(c)(2)(C), 123 Stat. at 300.

Section 1553 then provides that any person "adversely affected or aggrieved" by an agency's order "may obtain review of the order's conformance with this subsection, and any regulations issued to carry out this section, in the United States court of appeals for a circuit in which the reprisal is alleged in the order to have occurred." *Id.* § 1553(c)(5), 123 Stat. at 300. Review in the courts of appeals must conform to chapter seven of the Administative Procedure Act. *Id.* If the non-federal employer does not comply with the agency's order, the head of the agency is required to file an action for enforcement of such order in the United States district court in which the reprisal was found to have occurred in order to compel compliance. *Id.* § 1553(c)(4), 123 Stat. at 300. The district court may "grant appropriate relief, including injunctive relief, compensatory and exemplary damages, and attorneys fees and costs." *Id.*

BCI entered into contracts with the DOE under ARRA to install cable in the El Dorado and Beebe school districts in Arkansas. BCI hired Branden Mueller as a helper in April 2010, and in November 2010, BCI promoted Mueller to lead technician. In 2011, Mueller was assigned to work on both the El Dorado and Beebe projects. Mueller's employment was terminated in September 2011. In December, Mueller filed a complaint under § 1553(b) with the DOE's OIG, claiming that BCI had fired him for engaging in whistleblowing activity protected under § 1553(a). The parties do not dispute that Mueller originally was not paid the prevailing wage for either job, that he was in fact entitled to the prevailing wage, and that he complained

-4-

about being paid less than the prevailing wage.[2]  The parties do dispute, however, whether Mueller's complaints were a contributing factor to the termination of his employment.

The DOE's OIG conducted a six-month investigation into Mueller's claim that his complaints about not being paid the prevailing wage on BCI's ARRA projects were a contributing factor to the termination of his employment.  The DOE's OIG conducted interviews with Mueller and eight individuals identified by both Mueller and BCI and reviewed materials related to Mueller's dismissal.  Mueller reasserted his allegation that his complaints were a contributing factor to the termination of his employment.  Mueller told the investigators that his immediate supervisor told him to "be quiet or be unemployed" when Mueller complained about not being paid the prevailing wage.  BCI's witnesses, including three managers and one co-worker of Mueller, disputed Mueller's claims and, specifically, contested whether he was threatened by his manager to "be quiet or be unemployed."  BCI's witnesses claimed Mueller was fired because he was bad for morale, violated company policies, failed to follow his managers' orders, and did not complete projects in a timely manner.  Robert Brocchus, III, a former BCI co-worker of Mueller, disputed BCI's claim, telling investigators that he never heard anyone complain about Mueller's attitude on the job and that Mueller always finished the jobs either before or on the day they were due.  Thomas Creed, another former co-worker, also told investigators that he believed Mueller was not fired because of morale but rather because of Mueller's complaints regarding the prevailing wage.

The DOE's OIG report heavily relied on statements made by Mueller and other witnesses and often rested its conclusions on conflicting witness accounts.  For

[2]In fact, BCI sent him a check for the difference between what Mueller was paid on the El Dorado project and the prevailing wage in November 2011, and in April 2012, BCI did the same for Mueller's wages from the Beebe project.

example, the OIG found witnesses who contradicted the account of BCI's management witnesses to be credible, pointing out that "one manager stated that a subordinate had complained about Mueller's attitude and requested not to work with him again; however, that subordinate contradicted the manager's statement and said it was not true." Additionally, the DOE's OIG found the testimony of Mueller's supervisors regarding the reason he was fired to be unpersuasive and not credible. Specifically, the DOE's OIG "did not find credible Mueller's supervisor's statement that Mueller's attitude had changed after he was promoted to Lead Technician." The DOE's OIG concluded that an impermissible reprisal had occurred and that BCI had not established by clear and convincing evidence that Mueller would have been terminated regardless of his complaints. Thus, the DOE's OIG recommended that Mueller's complaint be sustained.

The DOE's OIG submitted a redacted version of its report to the DOE, to BCI, and to Mueller on June 6, 2012. The report did not include the summaries of the interviews the DOE's OIG had conducted with certain witnesses because the DOE's OIG is forbidden from disclosing such information without a privacy waiver. ARRA, § 1553(b)(5), 123 Stat. at 299. On June 13, 2012, BCI's counsel wrote a one-page letter notifying the DOE's OIG of receipt of the report and urging it to reconsider its conclusions because they "rely on unsubstantiated and self-serving statements by Mr. Mueller and other employees" and because the "overwhelming evidence reveals that Mr. Mueller was terminated by BCI for legitimate non-retaliatory reasons."

On June 25, 2012, the DOE provided BCI a new copy of the DOE's OIG report, as well as summaries of the interviews conducted with all persons from whom the DOE had obtained a waiver. In a letter accompanying the report, the DOE formally invited BCI to submit any additional material that might establish through clear and convincing evidence that Mueller's complaint was not a contributing factor to his dismissal. It set a deadline of noon on July 2, 2012 for receipt of this information. BCI requested an extension of time in which to file its response because

the DOE's deadline gave it less than five business days to compile a response. The DOE declined to provide an extension, explaining that the Secretary was required by statute to issue a decision within thirty days of receiving the inspector general's report. *See id.* § 1553(c)(2), 123 Stat. at 300. BCI then submitted its response one day late, on July 3, 2012.

The Secretary issued his final determination and order on July 6, 2012, which sustained the conclusions of the DOE's OIG. The Secretary noted that BCI's reply was submitted late, but that "[e]ven if the Department were to consider the evidence submitted in the late rebuttal, the rebuttal does not provide sufficient evidence to meet the standard of 'clear and convincing evidence' required to rebut a presumption of prohibited reprisal." Based solely on Mueller's complaint, on the redacted version of the DOE's OIG report and on BCI's written rebuttal, which he determined did "not affect the determination," the Secretary determined BCI's contentions were unsupported by any contemporaneous documentation and were contradicted by the testimony of other witnesses. Accordingly, under § 1553(c)(2)(A)-(B), the Secretary ordered BCI to reinstate Mueller with back pay.

Under § 1554(c)(5), BCI timely petitions for review of the Secretary's order, arguing that it was deprived of due process when it was forced to reinstate Mueller and pay him back pay without the benefit of either a pre- or post-deprivation hearing. Alternatively, BCI argues that it has demonstrated by clear and convincing evidence that Mueller would have been fired regardless of his complaints.

II.

We review a substantive agency decision only to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Whether an agency action violates the Constitution, however, is

reviewed *de novo*. *South Dakota v. United States Dep't of Interior*, 665 F.3d 986, 989 (8th Cir. 2012).

Due process prevents government actors from depriving persons of liberty or property interests without providing certain safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). All parties concede that BCI has a constitutionally protected interest in the funds it would be forced to pay Mueller in back pay, *see Dickman v. Comm'r of Internal Revenue*, 465 U.S. 330, 336 (1984), and that BCI has a constitutionally protected interest in its ability to fire employees, *see Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260-61 (1987); *Chernin v. Lyng*, 874 F.2d 501, 506 n.3 (8th Cir. 1989).

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Required procedures may vary according to the interests at stake, but "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1968)). In determining the adequacy of the procedures available under § 1553, we must consider the governmental interests, the private interests of those affected by the deprivation, and the risk of erroneous deprivations from the procedures used and the probable benefit of additional procedural safeguards. *Brock*, 481 U.S. at 262 (citing *Mathews*, 424 U.S. at 335). BCI argues § 1553 provides insufficient protection against the risk of erroneous deprivation because it does not provide for either a pre- or post-deprivation hearing. In response, the DOE asserts § 1553's procedures provide sufficient process without an administrative hearing because the opportunity to participate in the investigation of the DOE's OIG and to submit a written rebuttal, coupled with prompt judicial review, adequately protects against the risk of erroneous deprivation.

-8-

We begin by accepting as substantial the interests of both the DOE and BCI. The DOE has a substantial interest in encouraging whistleblowers to report improper conduct by protecting them from retaliatory actions. *See Brock*, 481 U.S. at 262. The DOE also has an interest in conserving government resources. *See Mathews*, 424 U.S. at 335. Similarly, BCI has a strong interest in controlling the makeup of its workforce and in the funds it might have to pay to the whistleblowers. *Brock*, 481 U.S. at 263.

In light of these interests, we now turn to the crucial question of whether the procedures available to BCI under § 1553 reliably protect against the risk of erroneous deprivation. The Supreme Court has held, "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). The requirements of confrontation and cross-examination are "even more important where the evidence consists of testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Greene v. McElroy*, 360 U.S. 474, 496 (1959). Where, as here, many of the DOE's reasons for its decision depend on the credibility of individual witness testimony, cross-examination must be available to minimize the risk of erroneous deprivation. *See id.* Thus, an employer facing monetary loss or other deprivation must at some point "have an opportunity to be confronted with all adverse evidence and to have the right to cross-examine available witnesses" in order to satisfy the demands of due process. *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir. 1981); *see also Brock*, 481 U.S. at 266 (resting its decision to uphold pre-deprivation procedures affording less than an evidentiary hearing in the context of a similar whistleblowing statute on the availability of cross-examination in a prompt post-deprivation evidentiary hearing); *Cleveland Bd. of Educ. v. Laudermill*, 470 U.S. 532, 545-46 (1985).

We reject the DOE's argument that, without an administrative hearing, § 1553's pre-deprivation procedures, coupled with its provision for judicial review, provide BCI with sufficient protection against the risk of erroneous deprivation. The opportunity to participate in the investigation of the DOE's OIG and submit a written rebuttal is no substitute for the opportunity to test adverse evidence and cross examine witnesses during a hearing. "[T]he primary function of the investigator is not to make credibility determinations, but rather to determine simply whether reasonable cause exists to believe that the employee has been discharged for engaging in protected conduct." *Brock*, 481 U.S. at 266. Additionally, a written rebuttal does not permit the fact-finder to assess the credibility of a witness. *See id.* (holding the opportunity to cross examine witnesses pre-deprivation is unnecessary where the statute provided for a post-deprivation hearing, appropriately reserving "[f]inal assessments of the credibility of supporting witnesses . . . to the administrative law judge"). Nor does this court's review provide sufficient protection against the risk of erroneous deprivation because our review of the Secretary's decision is limited to the record compiled by the agency. *See Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) ("It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision."). Where this record is compiled without conducting a hearing, subsequent consideration of that record cannot obtain the protections a hearing would afford to BCI. *See Greene*, 360 U.S. at 497 ("The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement . . . should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.") (quoting John Henry Wigmore, Evidence § 1367 (3d ed. 1940)).

For the aforementioned reasons, absent a hearing, the risk of erroneously depriving BCI of its money and its ability to fire its employees under § 1553 is substantial. Given this substantial risk of erroneous deprivation, the DOE's interests do not justify the total absence of a hearing. The DOE's interest in protecting

whistleblowers provides a rationale for not requiring a full evidentiary, pre-deprivation hearing where there is "'some kind of hearing' ensuring an effective 'initial check against mistaken decisions.'" *Brock*, 481 U.S. at 261 (quoting *Loudermill*, 470 U.S. at 542) (internal quotation marks and citation omitted). In the post-deprivation context, however, the DOE's only remaining interest in not providing a hearing is conserving administrative costs. This interest in conservation of resources does not trump BCI's countervailing interest in having an opportunity to challenge effectively the imposition of sanctions under § 1553(c)(2)(B). *See Goldberg*, 397 U.S. at 265-66. Therefore, we conclude that minimum due process for BCI in this context requires either a pre- or post-deprivation hearing that provides BCI with the opportunity to confront adverse evidence and cross examine adverse witnesses.

We thus proceed to consider whether § 1553 provides for such a hearing. On its face, § 1553 does not provide for a hearing. Despite claiming that 20 U.S.C. § 1234 provides a mechanism for it to conduct a hearing,[3] the DOE effectively concedes that it cannot conduct either a pre- or post-deprivation hearing consistent with § 1553.[4] The DOE argues, however, § 1553 provides sufficient post-

[3]Section 1234 requires the DOE to establish an Office of Administrative Law Judges to conduct hearings on certain unrelated matters, as well as "other proceedings designated by the Secretary." 20 U.S.C. § 1234(a).

[4]The DOE recognizes that "the Recovery Act's whistleblower protection scheme gives the Secretary no discretion whether to enforce a final determination and order." Given the Secretary's lack of discretion, the DOE explains that any hearing must take place prior to the expiration of the thirty-day, non-extendable, statutory period for the Secretary to enter his final order because the Secretary must have an independent opportunity to decide whether to concur in the decision of the administrative law judge. ARRA § 1553(c)(2), 123 Stat. at 300. Therefore, the DOE explains that any hearing conducted would have to occur within the thirty-day period. While the DOE argues it has the mechanism to conduct a hearing under 20 U.S.C. § 1234(a)(4), it concedes it would be "virtually impossible" for it to conduct a hearing

-11-

deprivation due process in two ways, either through the district court or upon remand from the court of appeals.

First, the DOE asserts that a district court can provide a post-deprivation hearing because BCI can assert defenses against an agency enforcement action filed in the district court. ARRA § 1553(c)(4), 123 Stat. at 300. A section 1553(c)(4) action for enforcement, however, does not contemplate a hearing on the underlying merits of the Secretary's final determination and order. *See id.* ("In any [enforcement action], the court may grant appropriate relief, including injunctive relief, compensatory and exemplary damages, and attorneys fees and costs."). Even if the district court could conduct a hearing, the only way BCI could receive this process would be by refusing to comply with the final order of the Secretary and then waiting for the Secretary to bring an enforcement action in district court. *Id.* BCI cannot initiate an action in the district court but instead must violate the order and wait for the Secretary to file an enforcement action. Violating the order in the hopes of receiving due process protections would require BCI to subject itself to exemplary damages and attorneys' fees. *Id.* Due process cannot be conditioned on requiring BCI to violate an order, exposing itself to statutory sanctions. *Cf. Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."). Therefore, the fact that the DOE can enlist the district court to enforce its order only if BCI chooses to violate the order cannot be sufficient due process. *Cf. Goldberg*, 397 U.S. at 269 (holding

---

within the mandated thirty-day period because a final determination from the Office of Hearings and Appeals, of which the Office of Administrative Law Judges is a subcomponent, takes anywhere from four months to two years. The concurrence suggests that the DOE could conduct a hearing during the period when the OIG investigates the complaint. *Post* at 15-16. The DOE, however, never argued that it could conduct a hearing during the investigatory period, and nevertheless, it is undisputed that BCI did not receive a hearing during the investigatory period.

-12-

due process *requires* an opportunity to confront and cross examine adverse witnesses where the evidence supporting an administrative action that injures an individual's property right consists of testimony of individuals).

Second, the DOE argues that BCI receives adequate post-deprivation due process because it can petition for review in the court of appeals.[5] *See* ARRA § 1553(c)(5), 123 Stat. at 300. No mechanism for a hearing—with presentation of evidence and witnesses—before a court of appeals exists. The DOE admits courts of appeals are not fact-finders and cannot hear witnesses; it argues, however, the courts of appeals can remand to the agency for further development of the record. *See id.* (providing judicial review shall conform to chapter seven of the Administrative Procedure Act). The DOE never argues we could remand for a full evidentiary hearing; it suggests we remand only for "additional investigation or explanation." In fact, remand for a hearing would be futile and insufficient to provide due process because the DOE has correctly recognized it has no authority to change the Secretary's final determination and order. *See supra* n.4; ARRA § 1553(c)(2), 123 Stat. at 300.

We conclude that BCI's due process rights were violated because the DOE never provided BCI a hearing and because the post-deprivation procedures available under § 1553 do not provide any opportunity for BCI "to confront and cross examine adverse witnesses," thereby depriving BCI of an essential element of due process. *See Goldberg*, 397 U.S. at 269; *Nevels*, 656 F.2d at 376. Thus, BCI did not have the

---

[5]The cases the DOE cites in support of this position are inapposite. In both *Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012) and *St. John's United Church of Christ v. Chicago*, 502 F.3d 616 (7th Cir. 2007), the petitioners were challenging on appeal the adequacy of judicial review in the absence of district court review—not whether the statutorily provided agency procedures violated due process. *See* 700 F.3d at 740-42; 502 F.3d at 628-30.

opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333.

## III.

We therefore grant the petition for review and vacate the order of the DOE.

MURPHY, Circuit Judge, concurring.

I concur with the panel's conclusion that the process provided to BCI did not meet the minimum requirements of due process and that therefore DOE's order should be vacated. Nevertheless, I write separately to note that the interest of the government in a case such as this is substantial and that the DOE likely would have had the ability to conduct a hearing that complied with the requirements of due process consistent with § 1553.

The time sensitive nature of the Recovery Act bears on the due process inquiry here. Due process is a flexible concept that lacks "fixed content." Mathews v. Eldridge, 424 U.S. 319, 334 (1974). So long as the fundamental requirement of an opportunity to be heard "at a meaningful time and in meaningful manner" is met, due process only "calls for such procedural protections as the particular situation demands." Id. at 333–334 (internal quotation marks omitted) (citations omitted). Thus, it is not every case in which "a hearing closely approximating a judicial trial is necessary." See id. at 333.

Assessing the government's interest requires consideration of the governmental "function involved." Id. at 334. As the panel correctly states, the government's interest in protecting whistleblowers is substantial. Supra at 8. It is also significant that through the Recovery Act the government intended to hasten economic recovery

-14-

by targeted expenditure of certain funds. Congress passed the Act with the statutory purpose to preserve and create jobs, promote economic recovery, and assist those most impacted by the recession. ARRA § 3(a), 123 Stat. at 115–16.

The Congressional desire for prompt action is made evident in the text of the statute. The Act instructs the executive authorities charged with its enforcement to commence "expenditures and activities as quickly as possible consistent with prudent management." Id. § 3(b), 123 Stat. at 116. In a likely attempt to stimulate spending, Congress also placed sunsets on the availability of certain funding. For example, the Inspector General received a $14,000,000 increase in funding for "oversight and audit" of ARRA expenditures, and the statute provides that this sum "shall remain available through September 30, 2012." Id. tit. VIII, 123 Stat. at 184. The government thus has a strong interest not only in protecting whistleblowers, but also in ensuring they are promptly paid what they are due under the Act. This interest means that extensive procedures should not be required so long as a contracting company like BCI receives the minimum process required, which includes an opportunity to cross examine adverse witnesses, see Brock, 481 U.S. at 266.

The DOE had the statutory authority for the process due in this case. Under 20 U.S.C. § 1234, the DOE's office of ALJs has the ability to conduct "proceedings designated by the Secretary." 20 U.S.C. § 1234(a)(4). The government contends that any hearing would have to occur within the 30 day period § 1553 provides for the Secretary to reach a decision, and that this time frame is insufficient because according to the DOE, hearings take between four months and two years. Supra at 11 n.4. There has been no articulated reason why a hearing with the opportunity for presentation of evidence and witnesses could not be held during the time § 1553 allocates for the Inspector General to investigate a complaint.

Under the statutory scheme the Inspector General is given 180 days to conduct an investigation and submit a report. Supra at 3. This period may be extended for

-15-

any additional period of time agreed upon by the Inspector General and the complainant, ARRA § 1553(b)(2)(B)(i), 123 Stat. at 298, or for an additional 180 days by the Inspector General alone, id. § 1553(b)(2)(B)(ii), 123 Stat. at 298. Under this scheme the Secretary should be able to reach a decision within the 30 day deadline, as required by § 1553(c)(2). Given the flexibility of due process requirements and ability of the Inspector General to extend investigations under § 1553(b)(2)(B) as the need arises, the DOE would have been able to comply with § 1553 while respecting BCI's due process rights.

While I agree with the panel's conclusion that "BCI's due process rights were violated because the DOE never provided BCI a hearing," I cannot agree with the summary statement that the procedures available under § 1553 would not have allowed the DOE to provide adequate process to BCI, see supra at 13.

_____