Carmen HERRERA, Plaintiff,

v.

TRABAJAMOS COMMUNITY HEAD START, INC., Defendant.

15 Civ. 9286 (JSR)

United States District Court,
S.D. New York.

Signed February 20, 2017

---

Bryan J. An, Matthew J. Blit, Justin Stedman Clark, Levine & Blit, PLLC, New York, NY, for Plaintiff.

Andrew James Rodgers, Jason Daniel Gerstein, Jeffrey David Rotenberg, DLA Piper U.S. LLP, New York, NY, for Defendant.

## OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Defendant Trabajamos Community Head Start, Inc. ("Trabajamos") received federal funds under the American Recovery and Reinvestment Act of 2009 ("ARRA"), the economic stimulus package enacted early in President Barack Obama's first term of office. Naomi Herrera–Castro ("Castro"), the former Executive Director of Trabajamos, claimed that she was fired for reporting a fraudulent scheme involving stimulus funds, and brought a one-claim "whistleblower" complaint against the defendant. Following discovery, Castro died, but her suit was taken over by her next-of-kin, Carmen Herrera. Trabajamos had meanwhile moved for summary judgment dismissing the suit. Having carefully considered the parties' arguments and submissions, the Court hereby denies the defendant's motion, save for one minor aspect of the motion that is granted.

"Summary judgment is proper only if 'the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d 58 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). Courts "view the evidence in the light most favorable to the party opposing summary judgment, draw all reasonable inferences in favor of that party, and eschew credibility assessments." Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166 (2d Cir. 2016) (alterations omitted).

The pertinent facts, undisputed except where noted, are as follows. Trabajamos is a not-for-profit corporation that provides Head Start programming to low-income children in the Bronx. Defendant Trabajamos Community Head Start, Inc.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"), ECF No. 18, ¶ 1; Plaintiff's Counter–Statement of Material Facts ("Pl. 56.1"), ECF No. 21, ¶ 1. Trabajamos receives federal funds administered by the New York City Administration for Children's Services ("ACS"), a Delegate Agency under the federal Head Start Program Performance Standards. Amended Complaint, ECF No. 33, ¶ 9; Defendant Trabajamos Community Head Start, Inc.'s Answer to Plaintiff's Amended Complaint, ECF No. 34, ¶ 9. In September 2012, Trabajamos's Board of Directors consisted of Sandra Martinez (Chairperson), Donald Antonetty, Stacey Andino (now Stacey Santiago), Paul Block, Vicky Gholson, Nilda Lont, and Monique Van Putten. Def. 56.1 ¶¶ 4; 17; Pl. 56.1 ¶¶ 4, 17. In December 2013, the Board consisted of Martinez (Chairperson), Block, Lont, and Gholson. Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.

Antonetty, though no longer affiliated with Trabajamos, was a central figure in the organization for many years, having served on the Board for around twenty years, and as Chairman for around ten. Pl. 56.1. ¶¶ 119–20; Defendant Trabajamos

Community Head Start, Inc.'s Reply to Plaintiff's Counterstatement of Material Facts ("Reply 56.1"), ECF No. 29, ¶¶ 119–20. He resigned as Chairman at some point in 2012, and resigned from the Board entirely on or about October 3, 2013. Pl. 56.1 ¶¶ 133–35; Reply 56.1 ¶¶ 133–35. The circumstances of his departure are somewhat disputed, but there is evidence that ACS, for which Antonetty also worked, forced him to resign because of a conflict of interest. Pl. 56.1 ¶¶ 132–35; Reply 56.1 ¶¶ 132–35. However, Antonetty continued to play a role in Trabajamos's affairs following his resignation, including advising Board member Nilda Lont on personnel matters (though the extent of his involvement is disputed). Pl. 56.1 ¶ 136; Reply 56.1 ¶ 136. Antonetty also allows Lont, a longtime friend, to live rent-free in a residence owned by Antonetty. Pl. 56.1 ¶ 128; Reply 56.1 ¶ 128.

Castro began working for Trabajamos in January 1986 as a Records Clerk. Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9. By March 2012, she had risen to the position of Acting Director of Trabajamos, and in September of that year, the Board appointed her Program (Executive) Director. Def. 56.1 ¶¶ 12, 14; Pl. 56.1 ¶¶ 12; 14. Castro, as Executive Director, was nominally responsible for managing the day-to-day operations of Trabajamos, Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7, but the parties dispute the true distribution of authority within the organization. Trabajamos maintains that Castro reported to the entire Board, which jointly supervised Castro and oversaw the organization; according to Castro, she reported to Antonetty, who exercised complete and unilateral control over Trabajamos. Def. 56.1 ¶¶ 3, 13; Pl. 56.1 ¶¶ 3, 13, 121–129; Reply 56.1 ¶¶ 121–129.

At some point between May and September 2013, Santiago, Trabajamos's Fiscal Officer and Castro's niece, brought to

Castro's attention certain invoices and payments Santiago suspected were fraudulent. Def. 56.1 ¶¶ 17, 99; Pl. 56.1 ¶¶ 17, 99, 137; Reply 56.1 ¶ 137. The precise details of the supposed fraud are unclear, but there is evidence that Antonetty had submitted invoices totaling around $9,000 under the names Victor Martinez and Luis Castillo.[1] Def. 56.1 ¶¶ 97–104; Pl. 56.1 ¶¶ 97–104, 138; Reply 56.1 ¶ 138. Castro had approved these invoices for payment when they were submitted, and had known that some of them sought payment for work that had not been performed by the person named in the invoice. Def. 56.1 ¶¶ 100, 102–04; Pl. 56.1 ¶¶ 100, 102–04.

According to Castro, at some point in August or September 2013, she confronted Antonetty about a check made out to Luis Castillo, and he became argumentative and repeatedly told her that he "need[ed] that check." Pl. 56.1 ¶¶ 140–41. At that time, Antonetty was still on the Board of Directors. Santiago testified that she also questioned Antonetty about the Castillo check, and Antonetty told her that he needed the check and that he was not otherwise able to pay himself for the work he did. Pl. 56.1 ¶ 139. Antonetty denies these conversations took place. Reply 56.1 ¶¶ 139–41. Castro took no further action on the fraudulent invoices at that time.

Antonetty resigned from the Board on or about October 3, 2013. Pl. 56.1 ¶ 135; Reply 56.1 ¶ 135. Around the same time, the Board began to report deficiencies in Castro's performance. For example, according to the minutes of an October 3, 2013 Board meeting, Castro's reports were mislabeled and incorrect, and there were security concerns at certain Trabajamos facilities. Def. 56.1 ¶¶ 36–41. Castro was present at this meeting, but denies that

the concerns reflected in the minutes were in fact discussed. Pl. 56.1 ¶¶ 36–41.

At some point after the October 3 Board meeting, Antonetty, Lont, and Castro met to discuss Castro's employment with Trabajamos. The circumstances of this meeting are disputed. Castro testified that Antonetty and Lont came to her office after working hours and demanded that she step down as Executive Director; she refused, but eventually agreed to a leave of absence. Def. 56.1 ¶¶ 44–45; Pl. 56.1 ¶¶ 44–45, 147, 149. According to Castro, Antonetty was motivated by his belief that she had disclosed his conflict of interest to ACS, which had forced him to resign from the Trabajamos Board. Pl. 56.1 ¶ 148. For his part, Antonetty testified that Castro arranged the meeting at her house in order to confess her own misconduct (she allegedly had rented a car for personal use with Trabajamos funds) and requested a leave of absence. Def. 56.1 ¶¶ 46–47; Reply 56.1 ¶¶ 147–49.

While all of this remains the subject of competing contentions, it is at least undisputed that after that meeting, Castro sent a letter to the Board requesting a leave of absence, which was granted within a few days. Def. 56.1 ¶¶ 52, 58; Pl. 56.1 ¶¶ 52, 58. According to Trabajamos, while Castro was on leave, Board member Lont discovered other indications of possible misconduct by Castro, including excessive petty cash receipts, payments to Castro's boyfriend Enrique Rivera for maintenance work, and disrespectful conduct toward staff. Castro, however, denies all misconduct and performance issues, claiming in particular that Antonetty had approved the decision to hire Rivera. Def. 56.1 ¶¶ 60–61; Pl. 56.1 ¶¶ 60–61. On November 12, 2013, Martinez sent Castro a letter

---

1. It appears that Victor Martinez is the teenage son of Board Chairperson Sandra Martinez, and that Luis Castillo is a friend of Antonetty's. See Santiago Deposition, Ex. C to Declaration in Opposition ("Clark Decl."), ECF No. 22, at 84–85.

stating that the Board had extended her leave for an additional two weeks. Def. 56.1 ¶¶ 62; Pl. 56.1 ¶ 62. On November 18, 2013, Castro requested a meeting with the Board, and Martinez responded that the Board would promptly hold one. Def. 56.1 ¶¶ 63–64; Pl. 56.1 ¶¶ 63–64.

According to Castro, at some point between November 18 and December 5, 2013, Castro had a telephone conversation with Block (another member of the Board) in which Castro told Block that Castro had evidence of fraud at Trabajamos. Pl. 56.1 ¶ 142. There is no other evidence of this call, and no evidence that Castro gave Block any details of the supposed fraud.

On December 2, 2013, the Board met to discuss Castro's performance.[2] Def. 56.1 ¶ 69. According to minutes of that meeting, Trabajamos "reviewed the issues of the Executive Director's performance". and "came to consensus that a decision was needed as to Ms. Castro continuing as the Executive Director and possibly being asked to step down," though no final decision was made. Def. 56.1 ¶¶ 70–71; 73; Ex. 36 to Rotenberg Decl.

Thereafter, on December 5, 2013, the Board (Martinez, Lont, and Block in attendance) held a special meeting with Castro and Santiago. Def. 56.1 ¶¶ 77–78; Pl. 56.1 ¶¶ 77–78. The circumstances of this meeting are disputed, but, in broad strokes, Castro and Santiago testified that Castro presented the fraudulent Victor Martinez and Luis Castillo invoices to the Board, which refused to discuss them,

whereas Lont and Block testified that they remembered no such allegations of fraud. Def. 56.1 ¶¶ 77–82, 85; Pl. 56.1 ¶¶ 77–82, 85, 144–46; Reply 56.1 ¶ 144–46; Santiago Deposition, Ex. C to Clark Decl., at 104–05. The Board voted to fire Castro after she left. Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84. According to the minutes of the meeting, Castro was terminated for a number of performance-related reasons, such as her failure to seek Board approval before hiring Santiago (her niece), her failure to seek Board approval of contracts over $5,000, and her failure to provide monthly fiscal reports. Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92; Ex. 5 to Rotenberg Decl. The following day, the Board sent Castro a termination letter signed by Martinez, Lont, and Block. Def. 56.1 ¶¶ 93–95; Pl. 56.1 ¶¶ 93–95.

In or around September 2014, Castro submitted a charge of being the subject of retaliation for whistleblowing to the Office of the Inspector General for the U.S. Department of Health and Human Services, which resolved to take no action on September 2, 2015. Def. 56.1 ¶¶ 112, 115; Pl. 56.1 ¶¶ 112, 115. On November 25, 2015, Castro filed the complaint in the instant action, claiming that Trabajamos had fired her for reporting misconduct. Def. 56.1 ¶ 116; Pl. 56.1 ¶ 116. At the Court's direction, on August 1, 2016, Castro filed an amended complaint that conformed to certain deposition testimony that had departed from her original complaint in material respects. See Amended Complaint, ECF

---

**2.** Castro, who was not at the meeting, nonetheless denies that this Board meeting took place, apparently on no better basis than that one of the attendees, Block, did not specifically recall when it occurred. Pl. 56.1 ¶¶ 69–74. But other attendees did and took formal minutes to boot. See Def. 56.1 ¶ 69; Ex. 36 to Declaration of Jeffrey D. Rotenberg in Support of Defendant Trabajamos Community Head Start, Inc.'s Rule 56.1 Statement of

Undisputed Facts ("Rotenberg Decl."), ECF No. 20. Moreover, it requires a highly contrived reading of Block's testimony to see any basis for Castro to deny that the meeting took place. The Court will deem such baseless denials as admissions. See Schoolcraft v. City of New York, 103 F.Supp.3d 465, 476 (S.D.N.Y. 2015) ("Denials without support or explanation are treated as admissions.").

No. 33. Castro died on September 11, 2016, after the instant motion was fully brief and argued, and the Court entered a stay. See Order dated Sept. 12, 2016, ECF No. 36. On January 30, 2017, the Court substituted Castro's sister, Carmen Herrera, as plaintiff, lifted the stay, and turned to deciding the instant motion. See Order dated Jan. 30, 2017, ECF No. 45.

Few courts have had the occasion to interpret the retaliation provision of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111–5, § 1553, 123 Stat. 115, 297, so there is little case law directly on point and no binding judicial authority. However, the ARRA retaliation provision was not created out of whole cloth, and many of its components have close (or even identical) counterparts in statutes that courts have encountered more frequently, such as the Sarbanes–Oxley Act, see 18 U.S.C. § 1514A, and the Whistleblower Protection Act, see 5 U.S.C. § 1221. Decisions interpreting these statutes are persuasive authority on the meaning of ARRA, as, of course, are the small number of decisions interpreting ARRA.

■ Two courts have framed the elements of an ARRA retaliation claim as follows: "(1) that [plaintiff] made a protected disclosure, (2) that [plaintiff] suffered a reprisal, and (3) that the protected disclosure was a contributing factor in the reprisal." See Wang v. Wash. Metro. Area Transit Auth., No. 14–cv–1189 (RC), 206 F.Supp.3d 46, 91, 2016 WL 4007067, at *32 (D.D.C. July 25, 2016) (alterations omitted); see also Hadley v. Duke Energy Progress, LLC, 677 Fed.Appx 859, 861, 2017 WL 496091, at *1 (4th Cir. Feb. 7, 2017) (unpublished) (similar). "If a plaintiff proves the three elements of an ARRA whistleblower claim, the employer can rebut the claim with clear and convincing evidence 'that the employer would have taken the action constituting the reprisal in the absence of the disclosure.'" Wang, 206 F.Supp.3d at 92, 2016 WL 4007067, at *32 (quoting ARRA § 1553(c)(1)(B)).

The Court agrees that these elements accurately track the requirements of the statute, see ARRA § 1553(a), (c), and adopts them with one slight modification. Using the term "reprisal" in the second and third elements could potentially lead to confusion, because it assumes that an adverse employment action was in fact taken in retaliation for a protected disclosure. If a whistleblower were fired solely for poor performance, it might be misleading to characterize the termination as a "reprisal," even though a termination would satisfy the requirement that the employee has been "discharged." See id. § 1553(a). Thus, for the sake of clarity, in discussing the second and third elements, the Court will use the specific adverse employment actions set forth in ARRA, viz., being "discharged, demoted, or otherwise discriminated against," see id., rather than the term "reprisal."

With that framework in mind, Trabajamos concedes that Castro was "discharged, demoted, or otherwise discriminated against," but raises several arguments under the first and third elements, and contends that it has rebutted Castro's claim with clear and convincing evidence.

ARRA protects disclosures of five distinct types of misconduct relating to "covered funds." See id. § 1553(a)(1)–(5). As relevant to this case, an employee makes a protected disclosure if she reports "information that the employee reasonably believes is evidence of . . . a gross waste of covered funds" to the Board of Directors or a supervisor. See id. § 1553(a)(2). Trabajamos argues, first, that Castro did not make a protected disclosure because she did not subjectively believe that the misconduct she reported violated the statute. But the statute requires no such subjective

belief. Rather the statute requires only that the whistleblower "reasonably believes" that the information disclosed "is evidence of ... a gross waste of covered funds." Id. Moreover, it would thwart ARRA's purpose—to encourage and protect reports of misconduct involving covered funds—to require laypeople to form legal conclusions concerning the misconduct they have discovered before coming within the statute's protection.

Trabajamos's argument to the contrary relies on a flawed analogy of ARRA to the Sarbanes–Oxley Act, whose whistleblower provision has been interpreted to require some level of subjective belief that the employer has broken the law. See Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221 (2d Cir. 2014) ("[R]elief pursuant to § 1514A turns on the reasonableness of the employee's belief that the conduct violated one of the enumerated provisions ...." (emphasis in original)). This argument fails for at least two reasons. First, Sarbanes–Oxley does not require that an employee reasonably believe that the employer violated Sarbanes–Oxley itself, as Trabajamos's analogy requires, but rather that she believe that the employer has violated one of a broad array of other securities and antifraud provisions. Second, that interpretation of Sarbanes–Oxley is based on statutory language that has no counterpart in the relevant portion of ARRA: Sarbanes–Oxley requires that a whistleblower reasonably believe that the reported misconduct constitutes a violation of specific, identified federal laws or SEC regulations, viz. "section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." See 18 U.S.C. § 1514A(a)(1). No comparable language appears in ARRA's gross waste provision. Accordingly, a plaintiff bringing an ARRA retaliation claim based on gross waste

need not subjectively believe that the reported misconduct violated the statute.

■ Trabajamos next argues that Castro did not subjectively believe that the fraudulent invoices she reported constituted "gross waste." It is clear from the language of the statute that the whistleblower must subjectively believe that there was gross waste and that that belief must be reasonable. See Hadley, 677 Fed.Appx. at 861, 2017 WL 496091, at *1 ("This 'reasonable belief' requires demonstrating both objective and subjective belief." (alterations omitted)) (interpreting ARRA).

■ However, it is clear that there is a genuine dispute of material fact as to whether Castro subjectively believed that she was reporting gross waste. As evidence that Castro lacked this belief, Trabajamos points out that Castro approved certain invoices despite being aware that they were potentially fraudulent, and that she waited for several months before reporting these invoices to the Board. Def. 56.1 ¶¶ 100, 102–04; Pl. 56.1 ¶¶ 100, 102–04. But viewed most favorably to the plaintiff, the evidence shows that Castro reported the fraudulent invoices to Antonetty, whom she characterized as her direct supervisor, within as little as one to two months. Def. 56.1 ¶¶ 99; Pl. 56.1 ¶¶ 99, 137, 140; Reply 56.1 ¶ 137. And even that modest delay was understandable, given that Antonetty, in Castro's view, controlled all aspects of Trabajamos and was the chief culprit in the fraud. See Pl. 56.1 ¶¶ 13, 121–124. Additionally, there is no real dispute that within a few months of confronting Antonetty with the fraud, Castro presented her findings to the Board. Def. 56.1 ¶¶ 77–82; Pl. 56.1 ¶¶ 77–82. Notwithstanding the slight delay and the fact that Castro processed some of the invoices, a reasonable jury could conclude that she believed the fraudulent invoices she re-

ported to Antonetty and the Board alike represented a gross waste.

■ A jury could likewise conclude that Castro's belief that the fraudulent invoices were a gross waste was objectively reasonable. Trabajamos points out that the dollar value of the fraudulent invoices was comparatively minor (around $9,000) and that it is possible that at least some of the invoiced work was performed, though not by the individuals named in the invoices. Reply 56.1 ¶ 138; See Castro Deposition, Ex. 6 to Rotenberg Decl., at 174–75, 363–64, 367–69. However, phrased differently, Trabajamos concedes that Castro discovered that Trabajamos had, at times, either paid people for work they never did or paid for "work" that was never done at all. Def. 56.1 ¶¶ 97, 102–04; Pl. 56.1 ¶¶ 97, 102–04. There is also evidence that some of this money went directly to Antonetty, the former Chairperson of the Board and a central figure at Trabajamos even after he stepped down; some also may have gone to the teenage son of the current Chairperson, Sandra Martinez. See Def. 56.1 ¶ 97; Pl. 56.1 ¶¶ 97, 138–38. This evidence is sufficient for a jury to find Castro's belief that there was gross waste at Trabajamos objectively reasonable.

Trabajamos's final argument under the first element is that Castro's reports of misconduct to individual Board members do not qualify as protected disclosures. See, e.g., Defendant Trabajamos Community Head Start, Inc.'s Reply Memorandum of Law ("Def. Reply"), ECF No. 27, at 5 n.4; Transcript dated July 13, 2016, at 22–23. ARRA protects disclosures made to, inter alia, the Board of Directors or "a person with supervisory authority over the

employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." ARRA § 1553(a). Trabajamos does not deny that Castro's report to the full Board on December 5, 2013 falls within the statute, but argues that Castro's two reports to individual Board members do not, because Antonetty lacked supervisory authority over Castro and because there is insufficient evidence of the report to Block.

■ However, it is clear that there is a genuine dispute of material fact as to whether Antonetty had either "supervisory authority" over Castro or "the authority to investigate, discover, or terminate misconduct" when Castro disclosed misconduct to him in August or September 2013.[3] Trabajamos points to evidence that Castro was, as a formal matter, personally responsible for day-to-day operations, that she reported to the entire Board of Directors, and that Antonetty claims to have had had "as little as possible" involvement in Trabajamos's day-today affairs. Def. 56.1 ¶¶ 7, 12–15; Reply 56.1 ¶¶ 121–24. However, viewing the evidence most favorably to Castro, a jury could find that although Castro was nominally the highest ranking Trabajamos officer, Antonetty was her de facto supervisor. Castro repeatedly testified that she reported directly to Antonetty, that all material decisions were subject to his approval, and that they spoke daily about all Trabajamos business. Pl. 56.1 ¶¶ 13, 122–24. That Antonetty continued to be involved in Trabajamos personnel matters even after he resigned further suggests that he had the requisite level of authority over Castro while he was still on the Board. For example, in a recorded conver-

---

**3.** Implicit in Trabajamos's position is an argument that reports to individual Board members do not constitute reports to the entire Board, because otherwise, Castro's report to Antonetty would fall within ARRA's protec-

tion even absent any supervisory authority. See ARRA § 1553(a). This argument was not briefed, but the Court will assume it is correct for purposes of this discussion, though there may be good arguments to the contrary.

sation with Santiago, Antonetty suggested that he was personally involved in the decision to grant her "Voluntary" leave of absence, which occurred after his resignation. See Ex. H to Clark Decl. ("Naomi asked for a leave of absence, which was granted.... There's no reason that I wouldn't, that we wouldn't grant her a leave of absence."). In light of this conflicting evidence, whether Antonetty had the requisite level of authority over Castro is a question for the jury.

■ However, Castro has failed to create a genuine dispute of material fact as to whether she made a protected disclosure to Block. There is no evidence that Block controlled the Board (indeed, such evidence as there is on this point suggests he was largely uninterested in Trabajamos affairs, see Pl. 56.1 ¶¶ 130–31; Reply 56.1 ¶¶ 130–31). Nor is there any evidence that Block had any personal supervisory or investigatory authority over Castro at any time. Moreover, at best, the evidence shows that Castro told Block on a single telephone call that she had some unspecified "evidence of fraud and waste," without supplying any details. Pl. 56.1 ¶ 142. Even viewing the evidence most favorably to the plaintiff, this is far too vague to satisfy the requirement that a whistleblower must report "information that the employee reasonably believes is evidence of ... a gross waste of covered funds." ARRA § 1553(a) (emphasis added).

Turning to the third element of Castro's claim, Trabajamos next argues that Castro failed to show that the protected disclosures just discussed were a "contributing factor" in the adverse employment actions taken against her. See ARRA § 1553(c)(1)(A)(i) (requiring whistleblowers to "demonstrate[ ] that a [protected] disclosure ... was a contributing factor in the reprisal"); see also Wang, 206 F.Supp.3d at 91, 2016 WL 4007067, at *32

("To recover under ARRA's whistleblower provision, a plaintiff must prove by a preponderance of the evidence ... that the protected disclosure was a contributing factor in the reprisal." (alterations omitted)).

■ While the Second Circuit has not construed the term "contributing factor" in this context, the lower courts agree that it means "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." See, e.g., Perez v. Progenics Pharm., Inc., 965 F.Supp.2d 353, 366 (S.D.N.Y. 2013) (Sarbanes–Oxley); Leshinsky v. Telvent GIT, S.A., 942 F.Supp.2d 432, 449 (S.D.N.Y. 2013) (same). It is also clear that "a whistleblower need not demonstrate the existence of a retaliatory motive on the part of the [person(s) ] taking the alleged prohibited personnel action in order to establish that [the whistleblower's] disclosure was a contributing factor to the personnel action." Marano v. U.S. Dep't of Justice, 2 F.3d 1137, 1141 (Fed. Cir. 1993) (Whistleblower Protection Act) (emphasis in original). More narrowly, ARRA provides two non-exclusive ways by which a plaintiff may use circumstantial evidence to establish that a protected disclosure was a contributing factor in an employee's discharge, demotion, or other negative employment action: by showing that "the official undertaking the reprisal knew of the disclosure" or that the timing of the employment action reasonably suggests that it was connected to the disclosure. See ARRA § 1553(c)(1)(A)(ii)(I)-(II).

Here, there is no dispute that Castro suffered three distinct negative employment actions. In late October 2013, Castro took a leave of absence, Def. 56.1 ¶¶ 52, 58; Pl. 56.1 ¶¶ 52, 58, and while the parties dispute whether it was voluntary, Trabajamos does not deny that it occurred in a context that falls within the statute's pro-

tections. See, e.g., Transcript dated July 13, 2016, at 23. On November 12, 2013, the Board extended Castro's leave of absence under such circumstances. Def. 56.1 ¶ 62; Pl. 56.1 ¶ 62. Finally, and most seriously, the Board fired Castro shortly after the December 5, 2013 Board meeting at which she presented the evidence of fraud. Def. 56.1 ¶¶ 93–94, 96; Pl. 56.1 ¶¶ 93–94, 96.

Thus, the issues under the contributing factor element are whether her disclosures to Antonetty and the Board were "factor[s] which, alone or in connection with other factors, tend[ed] to affect in any way" the Board's decisions to place her on a leave of absence, extend that leave, or ultimately fire her. Beginning with the disclosure to Antonetty, Trabajamos argues that the disclosure to Antonetty cannot have been a contributing factor in the Board's employment actions against Castro because there is no evidence that the Board was aware of the disclosure.

■ The Court is not persuaded. As an initial matter, no such evidence is required by the statute; as noted above, ARRA provides that "evidence that the official undertaking the reprisal knew of the disclosure" (here, the Board) is acceptable, but not necessary, evidence.[4] See ARRA § 1553(c)(1)(A)(ii)(I). More importantly, even though there is no direct evidence that the Board was aware of the disclosure to Antonetty, a jury could readily infer such knowledge from the abundant evidence that Antonetty maintained close per-

sonal and professional ties with the Board and was involved in matters directly relating to Castro's employment, even after he formally resigned from Trabajamos in early October 2013.

In particular, it is undisputed that at some point after Antonetty resigned from the Board, he attended the meeting at which he, Lont, and Castro discussed Castro's "voluntary" leave of absence. Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44. Indeed, viewed most favorably to Castro, the evidence shows that Antonetty spoke on behalf of Trabajamos at this meeting and made the decision to grant Castro's leave. See Ex. H to Clark Decl. ("Naomi asked for a leave of absence, which was granted.... There's no reason that I wouldn't, that we wouldn't grant her a leave of absence."). Similarly, on November 18, 2013, Lont asked Antonetty for comments on a draft email to Castro concerning the terms of Castro's leave ("do i [sic] need to write more"), and Antonetty directed her to make substantive changes. See Ex. J. to Clark Decl. ("[A]dd Other than a personal matter you are not to discuss business issues with any Trabajamos staff.").[5]

As for the disclosure to the full Board on December 5, 2013, Trabajamos acknowledges that the suggestive timing is circumstantial evidence in Castro's favor (see ARRA § 1553(c)(1)(A)(ii)(II))—Castro disclosed the fraud, left the meeting, and was promptly fired—but argues that no inference of causation arises because Trabaja-

---

4. Bechtel v. Administrative Review Board, 710 F.3d 443, 447 & n.5 (2d Cir. 2013), which found that Sarbanes–Oxley requires proof that the employer "knew or suspected" that the whistleblower engaged in protected activity, is not to the contrary, because unlike ARRA, that statute does not provide that knowledge of the official taking the reprisal is permissible evidence that can satisfy the contributing factor element. See ARRA § 1553(c)(1)(A)(ii)(I). The clear implication is

that an ARRA claimant may succeed without showing employer knowledge, so long as she adduces otherwise sufficient circumstantial evidence.

5. As noted above, Lont lives rent-free in a house owned by Antonetty, who continued to provide guidance to the Trabajamos Board even after Castro was fired. Pl. 56.1 ¶¶ 128–29; Reply 56.1 ¶¶ 128–29.

mos had resolved to fire her for misconduct beforehand. Trabajamos points out that it is undisputed that Castro had rented a car with a Trabajamos credit card, that she had hired her boyfriend to perform services for Trabajamos, and that the minutes of the December 5 Board meeting cited a number of deficiencies in Castro's performance as bases for firing her. Def. 56.1 ¶¶ 21–23, 25, 47; Pl. 56.1 ¶¶ 21–23, 25, 47; Ex. 5 to Rotenberg Decl.

Whether such alternative causes can, as a matter of law, defeat inferences from temporal proximity on summary judgment is an open question. The fact that ARRA separately provides that a defendant can rebut a plaintiff's case using evidence that the whistleblower would have been fired in any event suggests that such matters are not properly part of the contributing factor analysis. See ARRA § 1553(c)(1)(B). However, the Court need not resolve this question. In two recent Sarbanes–Oxley cases, the Second Circuit has assumed, without deciding, that a "legitimate intervening basis" for adverse action can, on summary judgment, defeat an inference from temporal proximity, but both times it found the proffered bases insufficient because they were the subject of materially conflicting evidence. See Yang v. Navigators Grp., 674 Fed.Appx. 13, 15, 2016 WL 7436485, at *2 (2d Cir. Dec. 22, 2016) (summary order); Sharkey v. JPMorgan Chase & Co., 660 Fed.Appx. 65, 67–68 (2d Cir. 2016) (summary order). That is the case here as well.

■ In particular, assuming arguendo that Trabajamos's argument is cognizable under the third element of an ARRA claim, the sharply conflicting accounts of the December 5, 2013 meeting preclude summary judgment. As background, the minutes of a Board meeting from December 2, 2013 indicate that the Board was considering asking her to resign, but had reserved a final decision for the coming meeting with Castro. See Def. 56.1 ¶ 69; Ex. 36 to Rotenberg Decl.; see also supra n.2. As for the meeting itself, Castro testified that after she presented the evidence of misconduct, the Board asked her if she was recording the conversation and told her to leave the meeting, which she did. Pl. 56.1 ¶¶ 144, 146; Castro Deposition, Ex. A to Clark Decl., at 201–03. Santiago, who attended at Castro's request, testified that the Board avoided discussing the problematic documents, initially asked Castro to accept a demotion, and later decided to fire her. Pl. 56.1 ¶ 145; Santiago Deposition, Ex. C to Clark Decl., at 104–05. Lont vaguely recalled discussing Martinez's son (in whose name some of the supposedly fraudulent invoices were made out) and that, at some point, Castro "stormed out." Reply 56.1 ¶ 146; Lont Deposition, Ex. 10 to Rotenberg Decl., at 59. Block effectively did not recall the meeting at all, see Block Deposition, Ex. 9 to Rotenberg Decl., at 38–39, and Martinez, the third Board member present, was not deposed in this case. Notwithstanding Trabajamos's premeeting probe into Castro's misconduct, a jury could credit Castro's and Santiago's testimony and find that Castro's disclosure of misconduct "tend[ed] to affect in any way" the decision to fire her.

Trabajamos's previous argument fits better under the section of ARRA providing that an employer may rebut the plaintiff's case with "clear and convincing evidence that the non-Federal employer would have taken the action constituting the reprisal in the absence of the disclosure." See ARRA § 1553(c)(1)((B); see also Yang, 674 Fed.Appx. at 14, 2016 WL 7436485, at *1 ("If a plaintiff carries the burden, the defendant employer can still secure a favorable judgment by showing no genuine dispute that the record clearly and convincingly demonstrates that the employer's adverse action would have been

taken even in the absence of protected activity.") (Sarbanes–Oxley). However, for much the same reasons that Trabajamos is not entitled to summary judgment on the contributing factor element, it is not entitled to summary judgment under this more demanding standard. Particularly fatal to Trabajamos's argument is the fact that the Board appears to have first taken an interest in Castro's poor performance and misconduct–the purported basis for her termination–after Castro had reported the fraudulent invoices to Antonetty. See Pl. 56.1 ¶¶ 140–41 (Castro reported to Antonetty in August or September 2013); Def. 56.1 ¶¶ 36–37 (minutes from an October 3, 2013 Board meeting discussing deficiencies in Castro's performance). Thus, even if the Board's investigation (which was chiefly run by Lont, Antonetty's close friend, associate, and rent-free tenant, see Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59) uncovered real misconduct, the record is equally consistent with Trabajamos searching for seemingly legitimate reasons to fire Castro in part because she had disclosed misconduct to Antonetty. Thus, at a minimum, Trabajamos has failed to show with clear and convincing evidence that it would have fired Castro regardless of her disclosures.

Finally, Trabajamos repeatedly points out that much of the evidence in Castro's favor is her own largely uncorroborated testimony, and that Castro has given shifting accounts of some key events. E.g., Def. Reply at 6–7; Transcript dated July 13, 2016, at 27–28. For example, Castro initially claimed that she had reported misconduct on only one occasion—to the Trabajamos Board on December 5, 2013—and it was not until her deposition that she added that she also disclosed to Antonetty and Block in the months before that meeting. See Transcript dated July 13, 2016, at 9–18. The suggestion seems to be that Castro's testimony should be discounted, in whole or in part, thus clearing the way for summary judgment to Trabajamos.

This argument is meritless. Castro's testimony is admissible evidence that cannot be disregarded on a motion for summary judgment merely because it conflicts with other portions of the record. See Yang, 674 Fed.Appx. at 14, 2016 WL 7436485, at *1 ("Yang's own testimony as to the communications at issue constituted admissible evidence and, thus, should not have been excluded from consideration in reviewing defendant's summary judgment motion."). The factual disputes Trabajamos identifies are classic jury fodder. Moreover, it is well-established that, except in the most extreme circumstances, courts "eschew credibility assessments" on a motion for summary judgment. See Smith, 839 F.3d at 166. Castro filed an amended complaint conforming to her deposition testimony; a jury is now required to evaluate the credibility of her claim.

Thus, in sum, with the one exception noted below, Trabajamos's motion for summary judgment is hereby denied. There are genuine issues of material fact as to (i) whether Castro made protected disclosures to Antonetty in August or September 2013 and to the Board on December 5, 2013; (ii) whether she made those disclosures with the objectively reasonable belief that the fraudulent invoices represented a gross waste of covered funds; (iii) whether those disclosures were a contributing factor in Trabajamos's decisions to place Castro on leave, extend the leave, and fire her; and (iv) whether there is clear and convincing evidence that Trabajamos would have fired Castro even if she had not reported the misconduct. However, Trabajamos's motion is granted to the limited extent that it argues that Castro's telephone call to Block does not qualify as a protected disclosure.

The parties are directed to jointly call Chambers by no later than February 24, 2017 to schedule a trial in this case. The Clerk of Court is directed to close docket entry 17.

SO ORDERED.