**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE CHIPPEWA CREE TRIBE OF THE ROCKY BOY'S RESERVATION, MONTANA, *Petitioner*, | No. 15-71772 |
| v. | OPINION |
| U.S. DEPARTMENT OF THE INTERIOR; RYAN K. ZINKE, in his official capacity as Secretary of the Interior; KEN ST. MARKS, *Respondents.* | |

On Petition for Review of an Order of the
Department of the Interior

Argued and Submitted March 12, 2018
San Francisco, California

Filed August 21, 2018

Before: Paul J. Watford and Michelle T. Friedland, Circuit Judges, and Gary Feinerman,[*] District Judge.

Opinion by Judge Friedland

---

[*] The Honorable Gary Feinerman, United States District Judge for the Northern District of Illinois, sitting by designation.

**SUMMARY**[**]

**Tribal Issues / Whistleblower**

The panel denied a petition for review by the Chippewa Cree Tribe challenging a decision of the U.S. Department of the Interior that ordered the Tribe to provide relief to Ken St. Marks, who was removed from the Tribe's governing body – the Business Committee – in retaliation for his whistleblowing.

St. Marks informed the Department of the Interior that members of the Business Committee were misusing federal stimulus funds awarded to the Tribe by the Department pursuant to the American Recovery and Reinvestment Act. The Act contains robust whistleblower protections.

The panel rejected the Tribe's challenges to the Department of Interior's decision. First, the panel held that St. Marks was an "employee" and eligible for whistleblower protection under the Act because he provided services on behalf of his employer, the Tribe. Second, the panel held that the Department's order did not infringe on the Tribe's sovereignty and powers of self-governance, and moreover, the Tribe voluntarily agreed to federal oversight when it accepted the stimulus funds. Third, the panel held that the Tribe did not have a due process right to a hearing with cross-examination before the Department reached its conclusion where the Tribe consented to the procedures outlined in the Act, which do not include a hearing. The panel noted that the Department did commit a procedural

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

error where the Tribe did not have access to the Inspector General's report until the Department issued its preliminary decision, but this was harmless error. Finally, the panel held that the Department did not err in finding that the removal of St. Marks was retaliatory.

The panel held that the Tribe could not raise for the first time on appeal its argument that the Department incorrectly calculated St. Marks's monetary award.

The panel addressed St. Marks's petition for review in a concurrently filed memorandum disposition.

## COUNSEL

Richard J. Zack (argued) and Jay A. Dubow, Pepper Hamilton LLP, Philadelphia, Pennsylvania, for Petitioner-Intervenor.

Jeffrey S. Rasmussen (argued), Fredericks Peebles & Morgan LLP, Louisville, Colorado, for Respondent-Petitioner.

Jaynie Lilley (argued) and Marleigh D. Dover, Appellate Staff; Chad M. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondents.

**OPINION**

FRIEDLAND, Circuit Judge:

Ken St. Marks, a member of the Chippewa Cree Tribe ("Tribe"), informed the Department of the Interior ("Department") that he believed members of the Tribe's governing body, known as the Business Committee ("Committee"), were misusing federal stimulus funds. Members of the Tribe subsequently elected St. Marks Chairman of the Committee, a position he held for five months before being removed by the other members of the Committee. St. Marks alleged that the Committee took this action in retaliation for his whistleblowing. After an investigation, the Department agreed and ordered the Tribe to provide relief, including back pay, to St. Marks. The Tribe now petitions for review, raising procedural and substantive challenges to the Department's decision. We deny the petition.[1]

**I.**

The stimulus funds at issue here were awarded to the Tribe by the Department pursuant to the American Recovery and Reinvestment Act ("ARRA" or "the Act"). Congress passed ARRA to mitigate the impact of the 2008 recession, in part by rapidly funding a variety of state, local, and tribal projects. *See* Pub. L. No. 111-5, § 3, 123 Stat. 115, 115–16 (2009). To safeguard these funds, Congress enacted robust whistleblower protections for employees of any non-federal entity receiving funds under the Act. ARRA § 1553(a),

---

[1] St. Marks also petitioned for review of the Department's order. We address his petition in a concurrently filed memorandum disposition.

123 Stat. at 297–302.[2] As relevant here, the Act provides that an employer may not discharge an employee in retaliation for the disclosure of "information that the employee reasonably believes is evidence of" the "gross mismanagement of an agency contract or grant relating to covered funds." § 1553(a)(1), 123 Stat. at 297.

When an employee files a whistleblower complaint, the office of the inspector general ("IG") for the agency awarding the funds has 180 days to investigate the complaint and submit a report of its findings "to the person, the person's employer, [and] the head of the appropriate agency." § 1553(b)(1)–(2), 123 Stat. at 297–98. After the agency receives the IG's report, it must determine whether the complainant has been the victim of a reprisal prohibited by ARRA's whistleblower protections. § 1553(c)(2), 123 Stat. at 300. If the employee establishes that his or her disclosure "was a contributing factor in the reprisal," § 1553(c)(1)(A)(i), 123 Stat. at 299, the burden then shifts to the employer to show by "clear and convincing evidence" that it would have removed the employee "in the absence of the disclosure," § 1553(c)(1)(B), 123 Stat. at 299. If the agency concludes that a prohibited reprisal has occurred, it may order various forms of relief, including compensatory damages and reinstatement. § 1553(c)(2), 123 Stat. at 300.

## II.

In 2009 and 2010, the Tribe received over $27 million in stimulus funds to complete construction of a water pipeline on its reservation. The Tribe had previously entered into funding agreements with the Department that authorized the

---

[2] Statutory references are to the American Recovery and Reinvestment Act unless otherwise indicated.

Tribe to administer the federal funds it received in those years.  *See* 25 U.S.C. § 5363.  As a condition of receiving the water pipeline funding, the Tribe executed two modifications to those preexisting agreements.  The modified agreements required the Tribe to comply with the Act's whistleblower protections, and specifically provided that those protections would be "enforceable pursuant to processes set up by ARRA."

Ken St. Marks owns a construction company that was involved in building the pipeline paid for by the stimulus funds.  In August 2012, St. Marks reported to the Department that he believed members of the Tribe, including individuals on the Tribe's governing Committee, were misusing ARRA funds.  Three months later, members of the Tribe elected St. Marks to serve as Chairman of the Committee.[3]

St. Marks contends that he informed members of the Tribe of the alleged fraud in an open letter on March 5, 2013, but the Committee disputes that the letter was ever sent.  Later that same week, St. Marks filed a whistleblower complaint with the Department, alleging that he had "been threatened and retaliated against," and that there was a petition circulating to remove him as Chairman.  The Committee subsequently removed St. Marks from his position on March 25, 2013, for "neglect of duty and gross misconduct."

---

[3] The Committee consists of eight general members and a Chairman, all of whom are elected by members of the Tribe.  Any member of the Committee, including the Chairman, can be removed by a vote of a majority of the other members of the Committee.

The IG began investigating St. Marks's whistleblower complaint that spring.  After interviewing employees of the Tribe and other witnesses, the IG submitted its report to the Department about a year later.  The report discussed the factual background of the investigation, but it offered no conclusion as to whether St. Marks was the victim of a prohibited reprisal.  The IG did not provide the Tribe with a copy of its report.

The Department reviewed the IG's report and issued its own preliminary order, concluding that the Tribe had engaged in a prohibited reprisal when the Committee removed St. Marks from office.[4]  At this point, the Tribe had its first opportunity to view the IG's report, which was attached to the Department's order.  The Department then gave both parties an opportunity to submit additional documentation, and specifically instructed St. Marks to detail the relief he sought under the Act.

In response, the Tribe filed a series of exhibits to attempt to rebut the Department's conclusion and demonstrate that the Committee had properly removed St. Marks from office for fraud and misconduct.  St. Marks submitted a request for monetary relief and reinstatement with supporting documentation.  He also asked that various restrictions be placed on the Committee's actions.

After analyzing the available evidence—including the Tribe's newly submitted exhibits—the Department issued a final order confirming its earlier decision that the Tribe had engaged in a prohibited reprisal.  The Department awarded

---

[4] Although the Inspector General's Office is within the Department of the Interior, we use "Department" to refer to the part of the agency responsible for issuing an order under § 1553(c)(2), 123 Stat. at 300.

St. Marks approximately $650,000, including back pay, front pay, travel costs, and legal fees, and it ordered the Tribe "to stop any and all reprisals against St. Marks arising out of" his whistleblower activities.    St. Marks had also requested compensatory damages arising from lost business opportunities, including his inability to secure a loan to purchase a nearby hotel, but the Department concluded that those losses were speculative and not clearly connected to the reprisal.  The Department further declined to award attorney's fees arising from St. Marks's other disputes with the Tribe, including two lawsuits the Tribe had filed against St. Marks in tribal court.  And, recognizing that reinstating St. Marks would necessarily implicate issues of "tribal sovereignty and self-determination," the Department did not require the Tribe to restore St. Marks to his position as Chairman.

The Tribe now petitions for review of the Department's order.

## III.

The Tribe raises five challenges in its petition for review: (1) St. Marks is ineligible for whistleblower protection because he is not an employee of the Tribe; (2) the Department violated the Tribe's sovereignty; (3) the Department violated the Tribe's procedural due process rights; (4) the Department misconstrued the facts in concluding that a prohibited reprisal occurred; and (5) even assuming that a prohibited reprisal occurred, the Department incorrectly calculated the monetary relief due to St. Marks. We address each in turn.

## A.

We first consider the Tribe's argument that St. Marks was not an "employee" and thus is ineligible for whistleblower protection under the Act. To qualify as an "employee," ARRA requires only that "an individual perform[] services on behalf of an employer." § 1553(g)(3)(A), 123 Stat. at 301. As the parties do not dispute that the Tribe is an employer under the Act, the question here is whether St. Marks performed services on behalf of the Tribe.

He undoubtedly did. Among other duties, the Tribe's constitution requires the Committee to "negotiate with the Federal, State and local governments on behalf of the tribe," "manage all economic affairs and enterprises of the tribe," and "approve or veto any sale, disposition, lease or encumbrance of tribal lands." As Chairman of the Committee, St. Marks was responsible for these tasks, as well as "presid[ing] over all meetings of the committee," "perform[ing] all duties of a Chairman," and "exercis[ing] any authority delegated to him by the committee." He was also paid a salary by the Tribe for serving as Chairman. No more is required to hold that St. Marks was an employee within the meaning of ARRA. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

This case is unlike those in which courts are "asked to construe the meaning of 'employee' where the statute containing the term does not helpfully define it." *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). The Americans with Disabilities Act, for example, states only that an employee is an

"individual employed by an employer." *Id.* (quoting 42 U.S.C. § 12111(4)). ERISA does the same. *See Darden*, 503 U.S. at 323 (quoting 29 U.S.C. § 1002(6)). In the face of those "circular" descriptions, the Supreme Court has turned to the common-law definition of an employee to determine the statutes' coverage. *Id.* ARRA, in contrast, defines the term "employee" without reference to the verb "employed." *See* § 1553(g)(3)(A), 123 Stat. at 301. As a result, we can apply the statutory definition without resorting to the common law for guidance.

The Tribe argues that St. Marks cannot be considered an employee because he was elected. But the Supreme Court has held that "[t]he mere fact that a person has a particular title—such as partner, director, or vice president—should not necessarily be used to determine whether he or she is an employee." *Clackamas,* 538 U.S. at 450; *cf. Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 32 (1961) ("There is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship."). And, in other statutes, Congress has expressly excluded elected officials from employee protections. *See, e.g.*, Age Discrimination in Employment Act, 29 U.S.C. § 630(f) ("[T]he term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof."); Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(f) (same); Fair Labor Standards Act, 29 U.S.C. § 203(e)(2)(C)(ii)(I) (excluding from the definition of "employee" any individual who "holds a public elective office of [a] State, public subdivision, or agency"). Were it obvious that elected officials could never qualify as employees, as the Tribe argues, then Congress would not have needed to specify in those statutes that elected officials were excluded. And the fact that Congress did not exclude elected officials from ARRA even though it

did so in other statutes suggests that Congress intended to include them within ARRA's whistleblower protections. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484–85 (1996) (comparing two different statutes to conclude that the language in one did not encompass a particular remedy because the inclusion of that remedy in the other demonstrated that Congress "knew how to provide" such a remedy when it so desired).

Congress's choice in this regard makes perfect sense. ARRA rapidly distributed billions of dollars in stimulus funding to tribes, states, and local governments—most of which have elected officials. To safeguard those funds, Congress implemented "a historic level of transparency, oversight and accountability," including protections for "[f]ederal and state whistleblowers who report fraud and abuse." H.R. Rep. No. 111-4, at 2–3 (2009). It would have substantially weakened those safeguards if Congress had excepted from protection all elected officials, particularly because those officials will often be in a good position to identify and report fraud.

**B.**

The Tribe next urges that the Department's order infringes its sovereignty and powers of self-governance, and that Congress did not intend such an outcome when it passed the Act. We disagree. The Act makes clear that it applies to tribes. *See* § 1610(b), 123 Stat. at 304–05 (requiring that an agreement distributing stimulus funds to a tribe for a project conducted under any of several tribal statutes "incorporate provisions to ensure that the agreement conforms with the provisions of this Act regarding . . . transparency, oversight, reporting, and accountability"). And when "Congress clearly indicates that Indian tribes are subject to a given law, no tribal sovereignty exists to bar the reach or enforcement

of that law." *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1096 (8th Cir. 1989). This doctrine applies even where federal law infringes a tribe's self-governance. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess.").

But even were we hesitant to conclude that a unilateral Congressional enactment authorized the agency to wade into issues implicating tribal governance, the Tribe voluntarily agreed to federal oversight when it accepted the stimulus funds. Put another way, as much as tribal sovereignty "rests in the hands of Congress," *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2037 (2014), it also rests in the hands of the Tribe. And when the Tribe accepted $27 million in ARRA funds from the federal government, it agreed to certain procedures for safeguarding the use of those funds. The Department's subsequent resort to those procedures did not violate the Tribe's sovereignty. *Cf. Madison v. Virginia*, 474 F.3d 118, 128 (4th Cir. 2006) ("[O]ne attribute of State sovereignty is the ability to waive it in pursuit of other objectives, in this case pursuit of federal funding.").[5] Reversing the Department's order on tribal sovereignty grounds otherwise would allow the Tribe to reap the benefits of the stimulus funds while using its sovereign status to shirk the Act's requirements.

---

[5] Because the Department only awarded monetary relief, the remedy imposed does not burden the Tribe's sovereignty any more than a remedy meant to compensate a more typical tribal employee for a grievance against the Tribe. This case does not require us to consider whether it would have violated the Tribe's sovereignty if the Department had ordered the Tribe to reinstate St. Marks to the role of Chairman of the Committee, because the Department did not do so.

## C.

The Tribe next argues that it had a due process right to a hearing with cross-examination before the Department reached its conclusion.  But the Tribe consented to the procedures outlined in the Act, which do not include a hearing, in exchange for millions of dollars in federal funds.  Just as the Tribe cannot complain that the ARRA whistleblower provisions it agreed to infringed its sovereignty, the Tribe also cannot complain that the accompanying adjudication procedures were insufficient.

It is well within Congress's power under the Spending Clause, U.S. Const. art. 1, § 8, cl.1, to "condition the receipt of funds, by states or others, on compliance with federal directives."  *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989).  And Congress "has corresponding authority under the Necessary and Proper Clause," U.S. Const. art. 1, § 8, cl.18, "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off."  *Sabri v. United States*, 541 U.S. 600, 605 (2004); *see also Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991) (explaining that Congress's "power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use").  Thus, although "the United States is not concerned with and has no power to regulate local political activities[,] . . . it does have power to fix the terms upon which its money allotments to states shall be disbursed."  *Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127, 143 (1947).  As a result, here Congress could undoubtedly bolster the Act's whistleblower protections by requiring grant recipients to agree to procedures that would allow agencies to investigate whistleblower complaints more efficiently.

The Supreme Court has articulated five restrictions on Congress's spending authority, *South Dakota v. Dole*, 483 U.S. 203 (1987), and ARRA stays well within them. *See id.* at 207–11. First, "the exercise of the spending power must be in pursuit of the general welfare." *Id.* at 207 (internal quotation marks omitted). Congress's goal of encouraging economic recovery easily complies with this restriction, even assuming it imposes a constraint at all. *See Mayweathers v. Newland*, 314 F.3d 1062, 1066 (9th Cir. 2002) (noting that the Supreme Court "seems doubtful that failure to advance the general welfare could ever provide adequate grounds for invalidating a federal statute").

Second, any conditions imposed on the receipt of funds must be clear and unambiguous so that recipients are aware of any consequences of accepting the funds. *Dole*, 483 U.S. at 207. In that sense, "legislation enacted pursuant to the spending power is much in the nature of a contract," where Congress's authority "to legislate . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Here, the Act expressly outlines the procedures that govern whistleblower complaints, and it is clear that those procedures do not include a hearing or other opportunity for cross-examination. *See* § 1553(b), 123 Stat. at 297–99. And in case there was any doubt, not only did acceptance of funds under the Act effectively form a contract, but the Tribe also expressly agreed by written contracts to ARRA's procedures.

Third, the "conditions must . . . bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992); *see also Dole*, 483 U.S. at 207. This requirement, too, is easily met by ARRA's whistleblower provisions. Because ARRA's whistleblower

procedures are designed to ensure that stimulus funds are properly spent, they relate directly to Congress's interest in ensuring that vast quantities of federal funds are used for their intended purpose—here, to construct the Tribe's water pipeline, and not to line tribal members' pockets.

Fourth, there must be no "independent constitutional bar" to the imposed conditions. *See Dole*, 483 U.S. at 210. This prong "stands for the unexceptionable proposition that the [spending] power may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* It does not prevent Congress from requiring the Tribe to forego some typically available procedural protections in exchange for federal funds, at least when those procedural limitations are imposed only on investigations related to those funds.

Fifth, Congress cannot use its spending power as a bludgeon. *See Dole*, 483 U.S. at 211 ("[I]n some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937))). But it did not do so here. Importantly, ARRA's conditions attached only to the stimulus funds the Tribe received to complete a discrete infrastructure project. It is true that the stimulus grant funded a project that was important to the Tribe, but an offer is not coercive just because it is attractive.

If the Tribe did not wish to take the minor risk that an agency might erroneously conclude that its termination of an employee was a prohibited reprisal, then it could simply

have refrained from applying for stimulus funds.[6]    But "Congress d[id] not have to sit by and accept the risk of operations thwarted by local and state improbity," *Sabri*, 541 U.S. at 605, while distributing a massive stimulus package.    It was well within Congress's prerogative to diminish—slightly—the full panoply of usual procedural protections to ensure that agencies could efficiently investigate whistleblower complaints.[7]

The Department did commit one procedural error, but the error was ultimately harmless.  The Act requires the IG to investigate a whistleblower complaint and then submit its report to the complainant, the employer, and the head of the appropriate agency. § 1553(b), 123 Stat. at 297–99. The Act thereby contemplates that an employer will have an opportunity to respond to the IG's report before the agency makes its determination.  Here, however, the Tribe did not have access to the IG's report until the Department issued its preliminary decision.  This was error; the statute plainly requires the IG to provide the employer and the agency with its report at the same time.  *See id.*  But because the Department issued both preliminary and final orders, the

---

[6] We are highly skeptical that a hearing would have led to a different outcome in this case in any event.

[7] We recognize that our decision is in tension with *Business Communications, Inc. v. U.S. Department of Education*, 739 F.3d 374 (8th Cir. 2013), which held that the Due Process Clause guaranteed a contractor a right to either a pre- or post-deprivation hearing when it was ordered to reinstate an employee who was terminated in alleged retaliation for reporting the contractor's non-compliance with ARRA. *See id.* at 381.  But we disagree with the Eighth Circuit's apparent assumption that general due process principles control where a statute passed pursuant to the spending power conditions the receipt of funding on agreement to specific procedures.

Department was able to cure the error resulting from this violation. After reviewing the preliminary order—to which the IG's report was attached—the Tribe submitted extensive rebuttal evidence directed to the merits of the underlying determination. The Department then evaluated all of the evidence again, and, if anything, in greater detail than it had in its preliminary order. As a result, this error does not warrant reversal.[8]

## D.

We next turn to the Tribe's argument that the Department erred in finding that the removal of St. Marks was retaliatory.

The Administrative Procedure Act ("APA") governs judicial review of an order issued under ARRA. § 1553(c)(5), 123 Stat. at 300 ("Review [under ARRA] shall conform to chapter 7 of title 5, United States Code."). Under the APA, we will set aside the Department's decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To assess whether the Department's decision survives such review, we "must determine whether [it] articulated a rational connection between the facts found and the choice made." *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229,

---

[8] We are not persuaded by the Tribe's argument that the Department had already definitively concluded when it issued its preliminary order that a prohibited reprisal had occurred, and that the Tribe's efforts to rebut the complaint were thus entirely futile. The Department's order shows that it reviewed the evidence without affording its initial determination any presumptive weight.

1236 (9th Cir. 2001). We have no trouble concluding that it did.

**1.**

ARRA lays out mechanisms for an employee to provide evidence of retaliation, and then for an employer to rebut it. The complainant must first offer evidence that a protected disclosure "was a contributing factor in the reprisal." § 1553(c)(1)(A)(i), 123 Stat. at 299. The Act allows a complainant to do this with circumstantial evidence, including "(I) evidence that the official undertaking the reprisal knew of the disclosure; or (II) evidence that the reprisal occurred within a period of time after the disclosure such that a reasonable person could conclude that the disclosure was a contributing factor in the reprisal." § 1553(c)(1)(A)(ii), 123 Stat. at 299.

There is no dispute that the Committee knew by September 2012 that St. Marks had informed the Department of his suspicions regarding misuse of stimulus funds. The Committee was thus aware of his disclosure at the time of the alleged reprisal in March 2013. *See* § 1553(c)(1)(A)(ii)(I), 123 Stat. at 299. And six months is certainly within the time frame that could lead a reasonable person to conclude that St. Marks's whistleblowing was a "contributing factor" in his removal. *See* § 1553(c)(1)(A)(ii)(II), 123 Stat. at 299; *cf. Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.").

The Tribe itself repeatedly emphasizes that the Committee was aware of St. Marks's disclosure in the fall of 2012. The Tribe seems to assume that this timing immunizes it because any prohibited reprisal would have to have taken

place within a few weeks of the Committee's learning of the disclosure, and St. Marks was not discharged until the end of March 2013. The Tribe's assumption is incorrect. Our caselaw does not require that an employer remove an employee within weeks of discovering a protected disclosure to support an inference that the two events are causally linked. *Cf. Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002) (explaining that "an eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory").[9]

## 2.

Once an employee provides evidence of a prohibited reprisal, the employer can rebut that showing by presenting "clear and convincing evidence that [it] would have taken the action constituting the reprisal in the absence of the disclosure." § 1553(c)(1)(B), 123 Stat. at 299. The Tribe presented seven alternative justifications for its decision to remove St. Marks, including that St. Marks allegedly improperly removed a tribal judge and verbally and sexually harassed tribal employees. But the Department soundly addressed these proffered justifications in its final order. In particular, the Department emphasized that the Tribe not only lacked clear and convincing evidence, but in fact lacked *any* "contemporaneous evidence documenting discovery of the alleged unauthorized behavior" or any "timely, formal . . . process and procedure to investigate and adjudicate any of the allegations." The Department reasonably concluded

---

[9] Because the Tribe admits that the Committee knew of St. Marks's disclosure in the fall of 2012, it does not matter whether the Committee knew of the open letter, or indeed whether the letter existed at all. The analysis in the Department's order did not turn on the letter. Rather, the Department emphasized that the Committee was aware of St. Marks's disclosure "months" before he was removed.

that a "laundry list of unsubstantiated findings in a tribal government document [was] wholly insufficient to support the drastic and significant measure of removing an elected official."

Moreover, the Tribe does not meaningfully contest the Department's conclusion that its proffered justifications were largely pretextual. Although the Tribe's brief reiterates its seven justifications for removing St. Marks from office, the Tribe does not substantively engage with the Department's reasons in its final order for finding those justifications pretextual. Even if we exercise our discretion not to treat this as a forfeiture of any challenge to the Department's conclusion that the Tribe engaged in a prohibited reprisal, the Tribe certainly has not presented a compelling argument that the Department's decision was arbitrary or capricious.

**E.**

Finally, the Tribe contends that, even if a prohibited reprisal occurred, the agency incorrectly calculated St. Marks's monetary award.  St. Marks reported to the Department that he was earning a yearly salary of $128,000—a figure that the Tribe did not challenge in its subsequent filing.  But the Tribe now argues that because St. Marks had at an earlier time voluntarily requested a $50,000 decrease in his yearly salary, the Department erred by calculating his front and back pay using the initial $128,000 figure.[10]

---

[10] It appears that St. Marks requested the pay cut to offset payments he had authorized to members of the Tribe who were in financial need.

The Tribe did not make this argument to the Department, and it cannot raise it for the first time on appeal.[11]  *See Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) ("It is a well-known axiom of administrative law that 'if a petitioner wishes to preserve an issue for appeal, he must first raise it in the proper administrative forum.'" (quoting *Tejeda-Mata v. INS*, 626 F.2d 721, 726 (9th Cir. 1980))). Thus, regardless of whether the Department should have used St. Marks's official salary or his reduced salary to calculate front and back pay, we affirm the agency's award.

## IV.

For the foregoing reasons, we **DENY** the Tribe's petition.

---

[11] One passing reference in the IG's file to St. Marks's offer to reduce his salary—in a document submitted by St. Marks, no less—was insufficient to put the Department on notice that the Tribe believed there was a discrepancy in the Department's calculations.