# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 18-60205

————

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2019

Lyle W. Cayce
Clerk

CHRISTOPHER FREY,

> Petitioner

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

> Respondent

————

Petition for Review of a Decision of the
United States Department of Health and Human Services,
Departmental Appeals Board

————

Before WIENER, DENNIS, and OWEN, Circuit Judges.

WIENER, Circuit Judge

Health Management Systems ("HMS") contracts with state health agencies to help them recover improperly paid Medicaid funds. Christopher Frey, a regional vice president for HMS, disclosed to supervisors that he believed some of HMS's billing practices were unlawful. Frey made these disclosures in 2009, and HMS fired him in 2013. Frey filed a whistleblower complaint, alleging that he was fired because of his disclosures. The Office of the Inspector General ("OIG") for the Department of Health and Human Services ("HHS") investigated Frey's claim and submitted a report to the HHS. In its report, the OIG found that although Frey had made protected

No. 18-60205

disclosures, (1) those disclosures were not a "contributing factor" in HMS's decision to fire Frey, and (2) HMS would have fired him absent the disclosures. The HHS adopted the OIG's report and denied Frey's claim. Frey petitioned this court for review of that decision.

## I. BACKGROUND

### A.    Statutory Framework

This case is governed by the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 ("Recovery Act" or "Act"), an economic stimulus package enacted early in 2009.[1] In addition to providing federal stimulus funds for infrastructure, health, and energy projects, the Recovery Act provides substantive protections for whistleblowers and administrative procedures for handling whistleblower complaints against employers that receive or use stimulus funds.[2]

The Recovery Act defines a "non-Federal employer" as a "State or local government receiving the [covered] funds and any contractor or subcontractor of the State or local government."[3] The Act prohibits employers that receive stimulus funds from retaliating against employees for disclosing evidence about the misuse of those funds:

> **§ 1553. Protecting State and Local Government Contractor Whistleblowers.**
>
> (a) PROHIBITION OF REPRISALS.—An employee of any non-Federal employer receiving covered funds may not be

---

[1] *Herrera v. Trabajamos Cmty. Head Start, Inc.*, 236 F. Supp. 3d 858, 860 (S.D.N.Y. 2017).

[2] Recovery Act § 1553; *see Bus. Commc'ns, Inc. v. U.S. Dep't of Educ.*, 739 F.3d 374, 376 (8th Cir. 2013) ("Through § 1553 of the [Recovery Act], Congress sought to encourage the reporting of improper action in connection with [Recovery Act] projects by providing whistleblower protections for employees of non-federal employers working on projects funded by [Recovery Act] appropriations.").

[3] Recovery Act § 1553(g)(4)(A)(ii).

2

> discharged, demoted, or otherwise discriminated against as a reprisal for disclosing, including a disclosure made in the ordinary course of an employee's duties, to the Board, an inspector general, . . . a State or Federal regulatory or law enforcement agency, a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct), . . . the head of a Federal agency, or their representatives, information that the employee reasonably believes is evidence of—
>> (1) gross mismanagement of an agency contract or grant relating to covered funds;
>> (2) a gross waste of covered funds; [or] . . .
>> (5) a violation of law, rule, or regulation related to an agency contract . . . or grant, awarded or issued relating to covered funds.[4]

The Act sets out specific burdens of proof for whistleblower complaints. A whistleblower "shall be deemed to have affirmatively established the occurrence of the reprisal if the person demonstrates that" the protected disclosure was "a contributing factor in the reprisal."[5] A whistleblower may demonstrate that a protected disclosure was a "contributing factor" by using circumstantial evidence, including:

> (I) evidence that the official undertaking the reprisal knew of the disclosure; or
> (II) evidence that the reprisal occurred within a period of time after the disclosure such that a reasonable person could conclude that the disclosure was a contributing factor in the reprisal.[6]

If the whistleblower "affirmatively establish[es]" that the protected disclosure was a contributing factor to the reprisal, the non-Federal employer has an "opportunity for rebuttal," to "demonstrate[] by clear and convincing

---

[4] *Id.* § 1553(a); *see* 48 C.F.R. § 2.907-2(6).
[5] Recovery Act § 1553(c)(1)(A)(i).
[6] *Id.* § 1553(c)(1)(A)(ii).

evidence that the non-Federal employer would have taken the action constituting the reprisal in the absence of the disclosure."[7] If the employer makes that showing, the agency "may not find the occurrence of a reprisal . . . ."[8] This burden-shifting framework uses the same "contributing factor" and "clear and convincing evidence" language as the standard for Sarbanes-Oxley Act whistleblower actions.[9]

The Recovery Act also sets out a process for evaluating complaints. First, the whistleblower must submit the complaint to the appropriate inspector general.[10] That inspector general must investigate the complaint and submit "a report of the findings of the investigation to the person, the person's employer, the head of the appropriate agency, and the Board."[11]

Next, within 30 days after receiving the inspector general's report, the agency must "determine whether there is sufficient basis to conclude that the non-Federal employer has subjected the complainant to a [prohibited] reprisal."[12] The agency must either "issue an order denying relief in whole or in part" or take one or more of the following actions: (a) "[o]rder the employer to take affirmative action to abate the reprisal"; (b) reinstate the person, with compensation, compensatory damages, and employment benefits; or (c) pay the complainant for his costs and expenses reasonably incurred for bringing the complaint.[13] If the agency issues an order denying relief in whole or in part, or fails to issue an order within 210 days of the submission of a complaint, the

---

[7] *Id.* § 1553(c)(1)(B).

[8] *Id.*

[9] *Compare id.* § 1553(c)(1)(A), *with* 49 U.S.C. § 42121(b)(2)(B); *see also Allen v. Admin. Review Bd.*, 514 F.3d 468, 475–76 (5th Cir. 2008) (collecting authority on the Sarbanes-Oxley Act standard).

[10] Recovery Act § 1553(b)(1).

[11] *Id.*

[12] *Id.* § 1553(c)(2).

[13] *Id.*

complainant will be deemed to have "exhausted all administrative remedies with respect to the complaint" and may sue the employer in federal district court.[14]

The Recovery Act authorizes direct review in the court of appeals for the circuit in which the alleged reprisal occurred for anyone "adversely affected or aggrieved by an order" issued by the agency.[15] Review in the court of appeals must conform to chapter seven of the Administrative Procedure Act ("APA").[16]

## B.    Factual Background

Petitioner-Appellant Christopher Frey filed a whistleblower complaint under § 1553, alleging that his employer, Health Management Services, Inc. ("HMS"), fired him in retaliation for protected disclosures. Defendant-Appellee United States Department of Health and Human Services ("HHS") investigated and denied his claim. Frey petitions this court for review of the agency action.

HMS is a publicly traded company that helps state health agencies recover Medicaid funds that have not been paid or have been inappropriately paid. It contracts with states to recover third-party liability ("TPL") claims.[17] Section 1553 of the Recovery Act applies to HMS because HMS contracts with states that received federal stimulus funds under the Recovery Act and is engaged by state Medicaid agencies to identify and recover TPL payments.[18]

---

[14] *Id.* § 1553(c)(3).

[15] *Id.* § 1553(c)(5).

[16] *Id.*

[17] Third Party Liability "refers to the legal obligation of third parties (e.g., certain individuals, entities, insurers, or programs) to pay part or all of the expenditures for medical assistance furnished under a Medicaid state plan. By law, all other available third parties must meet their legal obligation to pay claims before the Medicaid program pays for the care of an individual eligible for Medicaid."

[18] Recovery Act § 1553(g)(4)(A)(ii). The HHS does not dispute that § 1553 applies here. HMS, in contrast, maintains that it did not receive covered funds, so the Recovery Act's

No. 18-60205

Frey was a regional vice president for HMS from September 2006 until HMS fired him in May 2013. In that role, he managed sales and client relations within his assigned region. He alleges that in 2009, he made protected disclosures to HMS executives about (1) HMS's failure to bill timely for Medicaid reclamation claims, a practice he believed violated 42 C.F.R. § 433.139, and (2) HMS's practice of double-billing the state of Tennessee for Medicaid information.

Frey contends that after he made these disclosures, he experienced a pattern of retaliatory acts, including (1) a reduction of the territories for which he was responsible, (2) exclusion from high-level meetings, and (3) HMS's failure to pay him bonuses to which he was entitled. He maintains that these acts culminated in HMS firing him in May 2013. The parties dispute the reason for Frey's firing: HMS contends that it fired him as part of a reduction-in-force; Frey contends that there was no reduction-in-force and that instead he was fired in retaliation for his 2009 disclosures.

## C.     Litigation Background

After HMS fired Frey, he filed a whistleblower complaint with the Office of the Inspector General ("OIG") for the HHS, alleging that HMS fired him in retaliation for his 2009 disclosures. OIG investigators corresponded with Frey's counsel, who provided additional information and lines of questioning.

The OIG reviewed documents and interviewed Frey and several HMS employees. It issued its first investigative report to the HHS in August 2015.

---

whistleblower protections do not apply to it. This contention fails for two reasons. First, it is difficult to believe that HMS does not receive *any* covered funds through its contracts with state Medicaid agencies. Second, and more importantly, § 1553(g)(4)(A)(ii) specifically defines "non-Federal employer" as "with respect to covered funds received by a State or local government, the State or local government receiving the funds *and any contractor or subcontractor of the State or local government.*" HMS does not dispute that it contracts with states that received covered funds.

Frey's counsel wrote to the OIG, objecting to that report's conclusions. In June 2016, the OIG issued a second report to the HHS. Frey's counsel wrote to the HHS Secretary, objecting to the second report's conclusions.

In June 2017, the OIG issued its third and final investigative report to the HHS. That 23-page report set out the interviews the OIG had conducted and the documents it had considered. The OIG found that Frey had made protected disclosures in 2009. First, Frey had told his supervisor, Ron Singh, the executive vice president of the HMS Commercial Division, and Maria Perrin, HMS's executive vice president, that he believed HMS was billing TPL claims in an untimely and unlawful manner. The OIG also found that Frey told David Dawson, an HMS vice president, about HMS's practice of double-billing Tennessee for Medicaid information.

The OIG determined that HMS took an "unfavorable personnel action" against Frey by firing him, but "could not substantiate" Frey's allegations of a pattern of retaliation between 2009 and 2013. First, Frey alleged that HMS had cut the number of states for which he was responsible. The report states that, although Frey had lost some states, he had also gained other territory, including Louisiana. Second, Frey alleged that he was excluded from high-level meetings. The report states that investigators "were not able to find evidence to confirm that Frey was excluded from any meetings that he was permitted to attend." Finally, Frey alleged that HMS had denied him bonuses that his contract promised. The report states that Frey's bonuses were not guaranteed.

Although the OIG report determined that Frey had made protected disclosures and that HMS management knew of the disclosures when it fired him, the OIG concluded that the disclosures were not a contributing factor in HMS's decision:

> The OIG finds that Frey made protected disclosures in 2009 and that HMS management knew of Frey's disclosures. The OIG also finds that HMS took a personnel action against Frey (he was terminated as part of a RIF) and that certain HMS management officials responsible for the RIF were aware of Frey's protected disclosures at the time the RIF was conducted. Nevertheless, HMS has established by clear and convincing evidence that Frey would have been terminated as part of the RIF in the absence of the disclosures. As a consequence, the OIG finds that Frey's claim that he was subjected to whistleblower retaliation is unsupported.

Because of "the four years that passed between the protected disclosures in 2009 and Frey's termination in 2013" and a "lack of other evidence to support a finding of retaliation," a "reasonable person would not conclude that the disclosure was a contributing factor in the reprisal due to the extensive passage of time." The OIG also found that even if Frey's disclosures were a contributing factor in HMS's decision, HMS had established by clear and convincing evidence that it would have fired Frey in the absence of the disclosures.

Frey did not receive a copy of the final report until he filed a petition for review in this court.[19] In 2016 and 2017, Frey sent several emails to HHS officials asking for an update on the agency's decision. HHS officials responded to some of these emails with vague answers, and some went unanswered.[20]

In a January 2018 letter to Frey's attorney, the Associate Deputy Secretary of the HHS stated that he "agree[d] with the findings of the OIG," and denied Frey's claim. Although the January 2018 final agency action took

---

[19] Although § 1553(b)(1) states that after the inspector general completes the investigation, it "shall . . . submit a report of the findings of the investigation to the [complainant]," Frey does not challenge the OIG's failure to provide him the report.

[20] For example, on December 27, 2016, an HHS official assured Frey that the matter was "under active consideration" and stated that he expected that the agency would make a final determination "in the next couple of weeks, if not sooner." The agency did not make a final determination until January 2018.

much longer than the statutorily prescribed "30 days after receiving" the June 2017 OIG report, Frey does not challenge the timeliness of the agency action on appeal.[21] Instead, Frey timely filed a petition for review in this court.

## II. STANDARD OF REVIEW

Section 1553 of the Recovery Act requires us to review the HHS's final decision denying Frey's claim under the standards set out in Chapter Seven of the APA.[22] Under the APA, we "will set aside agency action, findings, and conclusions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .'"[23] Because the HHS is not charged with administering § 1553, we review its legal conclusions and interpretations of that statute de novo.[24]

The parties disagree about the standard of review for the HHS's factual findings. Both Frey and the HHS contend that those findings should be reviewed for substantial evidence. In contrast, HMS, an intervenor in this case, contends that the HHS's factual findings should be reviewed under the arbitrary and capricious standard. HMS maintains that agency findings "are reviewed under the substantial evidence standard only where there has been

---

[21] The HHS's delay is troubling, but not legally significant. After receiving the final June 2017 investigative report, the HHS took approximately seven months to deny Frey's claim, despite several requests for an update. Additionally, Frey received only the OIG's second, June 2016 investigative report to the HHS, and did not receive the final June 2017 report until after he filed the petition in this court. From Frey's perspective, the HHS's decision took at least a year and a half from when the HHS received the second report, and more than four years after Frey submitted his whistleblower complaint in November 2013.

[22] Recovery Act § 1553(c)(5).

[23] *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 131–32 (5th Cir. 2018) (quoting 5 U.S.C. § 706(2)).

[24] *Buffalo Marine Servs., Inc. v. United States*, 663 F.3d 750, 753–54 (5th Cir. 2011) ("The agency's legal conclusions are reviewed *de novo*, except for questions of statutory interpretation, where the court owes 'substantial deference to an agency's *construction of a statute that it administers.*'" (citation omitted) (emphasis added)).

a formal agency adjudication in which the agency was required to conduct a hearing on the record, which was not required and did not occur in this case."

HMS is correct. 5 U.S.C. § 706(2)(E) states that a reviewing court shall hold unlawful agency findings or conclusions found to be "unsupported by substantial evidence . . . reviewed on the record of an agency hearing provided by statute." The Recovery Act, unlike other whistleblower statutes, does not allow a complainant to request a hearing.[25] In this case, neither the HHS nor the OIG held a hearing. And other courts of appeals reviewing § 1553 claims have refrained from using the "substantial evidence" standard.[26]

The arbitrary and capricious standard applies to the HHS's final decision and factual findings. That standard "is 'highly deferential,'" and "focuses on whether an agency articulated a rational connection between the facts found and the decision made."[27] "[I]t is well-established that an agency's action must be upheld if at all, on the basis articulated by the agency itself."[28]

## III. ANALYSIS

In its decision letter, the HHS adopted the findings of the OIG's final investigative report. The parties do not dispute the OIG's findings that (1) Frey made a protected disclosure, (2) HMS management knew about that disclosure, or (3) HMS took an unfavorable personnel action against Frey.

The OIG recommended denying Frey's claim for two reasons: (1) his disclosures were not a "contributing factor" in HMS's decision to terminate him, and (2) even if the disclosures were a contributing factor, HMS has

---

[25] *E.g.*, 18 U.S.C. § 1514A(b)(2)(A); *see also Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008) ("Because [the statute] does not contain a standard of review and does not require that a formal hearing be held, the district court correctly reviewed the [agency's] final decision under the arbitrary and capricious standard . . . .").

[26] *See Chippewa Cree Tribe*, 900 F.3d at 1162; *Bus. Commc'ns Inc.*, 739 F.3d at 379.

[27] *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (citations omitted).

[28] *Id.* (citation omitted)

established by clear and convincing evidence that it fired Frey based on either (a) performance issues or (b) as part of a reduction-in-force that was implemented for a legitimate business purpose.

Frey challenges both conclusions. He contends that the HHS (1) misapplied § 1553's provision on the use of circumstantial evidence and (2) did not consider countervailing evidence that supports his claim.

## A.    "Contributing Factor"

The OIG concluded that Frey's disclosures were not a "contributing factor" in HMS's decision to fire him. It based that conclusion on (1) a four-year gap between Frey's 2009 disclosures and his 2013 firing and (2) a "lack of other evidence to support a finding of retaliation."

Section 1553(c)(1)(A)(ii) allows a complainant to use circumstantial evidence to establish that a protected disclosure was a contributing factor in a reprisal. Here is the statutory language:

> (i) IN GENERAL.—A person alleging a reprisal under this section shall be deemed to have affirmatively established the occurrence of the reprisal if the person demonstrates that a disclosure described in subsection (a) was a contributing factor in the reprisal.

> (ii) USE OF CIRCUMSTANTIAL EVIDENCE.—A disclosure *may be demonstrated* as a contributing factor . . . by circumstantial evidence, *including*—
> > (I) evidence that the official undertaking the reprisal knew of the disclosure; *or*
> > (II) evidence that the reprisal occurred within a period of time after the disclosure such that a reasonable person could conclude that the disclosure was a contributing factor in the reprisal.[29]

---

[29] Recovery Act § 1553(c)(1)(A) (emphasis added to focus on the parties' arguments).

We have stated in the context of the Sarbanes-Oxley Act's whistleblower provision that a "contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'"[30] Other courts have written that a "'contributing factor' is something less than a 'substantial' or 'motivating' factor."[31]

Frey contends that the HHS misinterpreted the language in the circumstantial-evidence provision by requiring *both* knowledge of the protected disclosure *and* temporal proximity. According to Frey, the separation of the "knowledge of the disclosure" provision (§ 1553(c)(1)(A)(ii)(I)) and the "reasonable period of time" provision (§ 1553(c)(1)(A)(ii)(II)) with an "or" indicates that an employer's knowledge of a protected disclosure, by itself, conclusively establishes that the disclosure was a contributing factor. The OIG found, and the parties do not dispute, that the HMS officials who fired Frey knew about Frey's disclosures. Frey insists that this finding "should have ended the contributing factor analysis" because either (a) knowledge of the protected disclosures or (b) temporal proximity is enough to establish that Frey's disclosures were a contributing factor in HMS's decision to fire him.

The HHS and HMS respond that although both knowledge of a protected disclosure and temporal proximity have some bearing on the contributing factor element, a finder of fact may reasonably conclude that one of those factors alone does not always establish that element. They focus on the statute's use of "may" and "including," permissive words indicating that an employer's knowledge of a disclosure or temporal proximity between a disclosure and an employment decision may be considered, but the presence of

---

[30] *Allen*, 514 F.3d at 476 n.3 (citation omitted).
[31] *Gerhard v. D Constr., Inc.*, 2012 WL 893647, at *3 (N.D. Ill. Mar. 14, 2012) (quoting *Addis v. Dep't of Labor*, 575 F.3d 688, 691 (7th Cir. 2009)).

but one of those factors does not mandate the conclusion that the disclosure was a contributing factor in the decision.

The parties' dispute comes down to whether § 1553's circumstantial-evidence provision is mandatory or permissive. According to Frey, evidence that an employer had knowledge of a protected disclosure *always* establishes that disclosure was a contributing factor. According to the HHS and HMS, an employer's knowledge of a protected disclosure *may*–but does not always–establish that a disclosure was a contributing factor.

There are few cases that examine § 1553,[32] and only two court of appeals cases directly review an agency action under that provision.[33] We have found no court that has considered the specific issue presented here. The closest cases to this one are *Hadley v. Duke Energy Progress, Inc.*, 2016 WL 1071098, at \*4–6 (E.D.N.C. Mar. 17, 2016), and *Gerhard v. D Constr. Inc.*, 2012 WL 893673, at \*2–4 (N.D. Ill. Mar. 14, 2012).

In *Hadley*, the district court considered a complaint in which the whistleblower alleged that he had made protected statements and was fired ten months later.[34] The court held that the ten-month gap between the "bulk of [the whistleblower's] alleged protected statements . . . and his termination" did not support a causal inference that the disclosure contributed to the firing.[35]

In *Gerhard*, the court considered a whistleblower complaint in which the only circumstantial evidence was a one-month gap between the protected

---

[32] *Hadley v. Duke Energy Progress, Inc.*, 2016 WL 1071098, at \*4–6 (E.D.N.C. Mar. 17, 2016), *aff'd*, *Hadley v. Duke Energy Progress, LLC*, 677 F. App'x 859 (4th Cir. 2017); *Herrera*, 236 F. Supp. 3d at 858; *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 91–93 (D.D.C. 2016); *Gerhard*, 2012 WL 893673, at \*2–4.

[33] *Chippewa Cree Tribe*, 900 F.3d at 1126; *Bus. Commc'ns, Inc.*, 739 F.3d at 374.

[34] *Hadley*, 2016 WL 1071098, at \*6.

[35] *Id.*

disclosure and the firing, and there was "no evidence" that the sole decision-maker in the firing "was even aware that [the whistleblower] was engaging in ARRA-protected activities."[36] The court held that the disclosures were not a contributing factor, explaining that a "temporal connection, standing alone, rarely suffices to show a causal connection, even for summary judgment purposes."[37] *Gerhard* addressed the analytical opposite of this case: Here, there was knowledge of the protected disclosure, but no temporal proximity; in *Gerhard*, the employee was fired one month after the disclosure, but the decisionmaker did not know about the disclosure.

Subsection § 1553(c)(1)(A)(ii) sets out "two non-exclusive ways" that a petitioner *may* use circumstantial evidence to show that a protected disclosure contributed to a decision to fire him.[38] The types of circumstantial evidence include, but are not limited to, (a) an employer's knowledge of a protected disclosure or (b) a reasonable temporal relationship between the disclosure and the firing. The statute states that a reprisal "may be demonstrated by circumstantial evidence"; it does not say that *whenever* either of those factors is present, a disclosure *shall* or *must* be deemed a contributing factor.[39] Congress's use of "shall" in the immediately preceding subsection bolsters this interpretation.[40]

---

[36] *Gerhard*, 2012 WL 893673, at *3.

[37] *Id.*

[38] *Herrera*, 236 F. Supp. 3d at 867.

[39] *See Kingdomware Techs., Inc. v. United States,* 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *In re Pac. Lumber Co.*, 584 F.3d 229, 245–46 (5th Cir. 2009) ("The non-exhaustive nature of the three subsections [separated by an "or"] is inconsistent with treating them as compartmentalized alternatives.").

[40] *Compare* § 1553(c)(1)(A)(i) ("A person alleging a reprisal under this section *shall be deemed to* have affirmatively established the occurrence of the reprisal . . . ."), *with* § 1553(c)(1)(A)(ii) ("A disclosure *may be demonstrated* as a contributing factor in a reprisal . . . by circumstantial evidence . . . .").

Moreover, a four-year gap between a protected disclosure and an adverse employment action is longer than any time frame in which any court has concluded that a disclosure was a contributing factor to a reprisal.[41] And, in the different context of the Age Discrimination and Employment Act, we have held that a ten-month gap between an employee's protected action and firing did "not support an inference of retaliation, and rather, suggest[ed] that a retaliatory motive was highly unlikely."[42]

The four years that passed between Frey's 2009 disclosures and his 2013 firing, as well as a "lack of other evidence" supporting a finding of retaliation, bolsters the HHS's conclusion that Frey's disclosures were not contributing factors in HMS's decision to fire him, and is enough to satisfy the "highly deferential" arbitrary and capricious standard.

## B.    Whether Frey Would Have Been Fired Absent the Disclosures

If an employee affirmatively establishes an unlawful reprisal, the employer may rebut that showing with "clear and convincing evidence that [it] would have taken the action constituting the reprisal in the absence of the disclosure."[43] The OIG determined that, even if Frey's disclosures were a contributing factor in HMS's decision to fire him, HMS had nonetheless

---

[41] *Chippewa Cree Tribe*, 900 F.3d at 1162 ("[S]ix months is certainly within the time frame that could lead a reasonable person to conclude that [the petitioner's] whistleblowing was a 'contributing factor' in his removal."); *Hadley*, 2016 WL 1071098, at *6 ("The ten-month time period between the bulk of [the plaintiff's] alleged protected statements . . . and his termination does not support a causal inference."); *Gerhard*, 2012 WL 893673, at *3 ("Here, there is nothing beyond slight temporal proximity that supports the inference of reprisal."); *see also Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348–49 (4th Cir. 2014) (holding that a 20-month gap between a protected activity and a firing "weighs against a finding that it is more likely than not that the alleged protected activities played a role in [the whistleblower's] termination" in a Sarbanes-Oxley Act whistleblower case).

[42] *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994).

[43] Recovery Act § 1553(c)(1)(B).

established by clear and convincing evidence that it would have fired him in the absence of the disclosures. The OIG specifically concluded:

> Nevertheless, HMS has established by clear and convincing evidence that Frey would have been terminated as part of the RIF in the absence of the disclosures.
>
> . . . .
>
> [I]nvestigators found clear and convincing evidence that HMS would have terminated Frey in the absence of his disclosures due to his poor performance. HMS provided clear and convincing evidence that Frey had significant performance problems and that HMS's concerns about Frey's performance pre-dated any of his protected disclosures. Two of Frey's past supervisors, [Donna] Price and Kim Glenn, spoke negatively about his work performance at HMS. [David] Dawson told investigators that Frey was the lowest performing RVP that Dawson supervised. Additionally, investigators obtained Frey's 2007 HMS performance evaluation, which rated Frey average or below average in many elements. Finally, Frey was not the only employee terminated in the RIF. Between 2013 and 2014, 107 HMS employees were terminated as part of a RIF. This supports HMS's claim that the RIF was for [a] legitimate business purpose.

Frey challenges these findings on the ground that the HHS failed to consider "significant countervailing evidence" that contradicted HMS's explanation that it fired him as part of a reduction-in-force. Frey points to the facts that (1) there was conflicting testimony of several HMS employees; (2) he was fired on a Tuesday rather than a Friday or at the end of a month; (3) he was not fired as part of a group of employees; (4) he was the only regional vice president that was fired; and (5) there was not even one memo or personnel form referencing a reduction-in-force. According to Frey, these facts combine to show that the HHS simply accepted HMS's explanation without getting into whether the reduction-in-force was a pretext for retaliation.

Frey also maintains that the OIG's conclusion that he had performance issues does not account for the evidence that he was a good employee. He points to statements describing him as "easy to get along with," "a good employee," an "Idea Guy," and that he had "no personality conflicts," "no issues with his professional reputation," and "good ideas." Similarly, Frey contends that the OIG relied too heavily on one negative performance review from 2007.

In its report, the OIG provided an investigative summary of the documents it reviewed and the persons it interviewed. The facts indicating that HMS fired Frey for poor performance or as part of a reduction-in-force include:

- Donna Price, an HMS vice president and Frey's direct supervisor (1) stated that she "considered Frey a charming person, but professionally considered Frey her worst employee"; (2) did not trust Frey and "caught Frey lying on a few occasions" about "being at work when she could not get a hold of him"; (3) wrote a bad performance review about Frey in 2007; and (4) said Frey was fired during a reduction-in-force. (Price too was fired during the same reduction-in-force as was Frey, but she was rehired to a new position ten months later.)

- David Dawson, another HMS vice president and Frey's supervisor, rated "Frey the third best regional VP [of the three regional VPs] he supervised." Dawson also described Frey as "a good employee, but not great."

- Ron Singh, the Executive Vice President of the HMS Commercial Division, stated that he had "heard internally that Frey was laid off as part of a reduction in force" and that he was "not surprised about Frey's lay off because others were also laid off."

- Ginny Meltzer, HMS's Assistant Controller for Corporate Finance, stated that "Frey was laid off during a large reduction in force. This reduction in force was more about efficiency than financial reasons."

- Tracey South, HMS's Vice President for Human Relations, stated that "Maria Perrin [another HMS VP] decided that HMS had to flatten their organizational structure through a reduction in force." South

17

also stated that the regional VP position was "retitled," the "duties of multiple positions were merged," and a "layer of management was removed." She also stated that "[t]he RIF was based on business needs and that was why it was not conducted all at once. Frey was one of the first VP's to be removed because there was not a critical need for him."

- Kim Glenn, HMS's Senior Vice President for Business Development, stated that "Frey was terminated as part of a RIF. The organization was flattening its structure to achieve cost savings. This included a reduction of 13 individuals in the Government Services Department over a 12 month period."

- Frey's 2007 negative performance evaluation.

- A list of many employees fired within the same year as Frey that stated "Reduction" as the reason for the termination. That list includes several other vice presidents: a "VP of Operations," a "VP of Prod Dev," an "SVP for New markets," a "VP MCO Client Development," a "VP/Process Engineering," a "VP/Talent Strategies & HR Ops," and a "Corporate VP/COB."

In short, the OIG considered statements from Frey's direct supervisors that Frey had performance issues, and statements from several other HMS officers and employees that he was fired as part of a reduction-in-force.

Neither does Frey's contention that the OIG did not consider countervailing, favorable evidence comport with the OIG's interview notes. The OIG report sets out a summary of its interview with Frey and his lawyer, as well as Frey's statement that he believed that HMS's explanation that it fired him for "money saving issues" was "suspicious" based on its treatment of other employees. The record also shows that the OIG considered Frey's allegations that (1) he was the only regional vice president that HMS fired, (2) other employees who were terminated in the reduction-in-force were later rehired, (3) Frey was fired on a Tuesday rather than a Friday or the end of the month,

18

and (4) there were no written policies for reductions-in-force. The fact that investigators asked other HMS employees about Frey's concerns indicates that the OIG considered the evidence, but based on other evidence, concluded that HMS had met its burden. Although Frey might disagree with the HHS's *evaluation* of the countervailing evidence he submitted, the agency did consider it.

The OIG's summary of its interviews with Frey's supervisors and several other HMS employees sufficiently supported the HHS's conclusion that HMS fired Frey because of his poor performance or as part of a reduction-in-force. True, some employees were complimentary of Frey and there was some inconsistent testimony about the reduction-in-force. But the arbitrary and capricious standard is highly deferential and requires only a "rational connection" between the facts found and the agency's decision.[44] Given that the OIG considered some facts that supported its conclusions and other facts that did not, we must defer to the HHS's decision to deny Frey's claim.[45]

## IV. CONCLUSION

For the foregoing reasons, we deny Frey's petition.

AFFIRMED

---

[44] *Knapp*, 796 F.3d at 453; *Chippewa Cree Tribe*, 900 F.3d at 1162.

[45] *See Chippewa Cree Tribe*, 900 F.3d at 1162–63.